**WECOSIGN, INC., Plaintiff,**

**v.**

**IFG HOLDINGS, INC.,
et al., Defendants.**

**Case No. SACV 10–1200–JST (MLGx).**

United States District Court,
C.D. California.

Jan. 23, 2012.

IFG Holdings Inc., Woodland Hills, CA, pro se.

Michael Adams, Woodland Hills, CA, pro se.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

JOSEPHINE STATON TUCKER, District Judge.

Before the Court is a Motion for Default Judgment filed by Plaintiff Wecosign, Inc. ("Plaintiff"). (Mot., Doc. 76.) Plaintiff seeks the entry of default judgment against seven Defendants: IFG Holdings, Inc. ("IFG"), Associated Concents Group LLC ("ACG"), Michael Adams ("Adams"), Ted Williams ("Williams"), Mark Avila ("Avila"), Stan Jones ("Jones"), and Robert Miller ("Miller") (collectively, "Defendants"). (Mot. at 1.) Plaintiff is not seeking entry of default judgment against the eighth and final Defendant, Tara Walker ("Walker"). (*Id.*) Instead, Plaintiff and Walker separately entered into a "Stipulation for Consent Judgment with Respect to Plaintiff Wecosign, Inc. and Defendant Walker." (Consent Judgment, Doc. 84.) Plaintiff seeks permanent injunctive relief, monetary damages, attorneys' fees, and costs. (Mem. of P. & A. at 1, Doc. 77.) Having taken Plaintiff's Motion under submission and read and considered the papers, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion, and defers ruling on Plaintiff's claim for "lost profits" damages to allow for submission of additional evidence.

Adam Jay Jaffe, Wecosign, General Counsel, Santa Ana, CA, John W. Holcomb, Knobbe Martens Olson and Bear LLP, Riverside, CA, Nicholas Matthew Zovko, Knobbe Martens Olson and Bear LLP, Irvine, CA, for Plaintiff.

## I. Factual Background

Plaintiff is the owner of the service mark "Wecosign" ("the Mark"). (Compl. ¶ 5, Doc. 1.) Since at least 2005, Plaintiff "has continuously and extensively adver-

tised, offered, and rendered financial services" under the Mark. (*Id.* ¶ 15.) Plaintiff maintains a web presence for the purposes of providing information about its services offered under the Mark. Plaintiff also offers an online application for those services at its website, located at the domain names <wecosign.com>, <wecosign.biz>, <wecosign.org>, and <wecosign.info>, among others. (*Id.*) In 2007, Plaintiff filed an application to register the Mark, and subsequently became the owner of U.S. Registration No. 3,677,202 for the Mark for financial guaranty and surety services for renters. (*Id.* ¶ 16.)

Defendant IFG is a Nevada corporation with its principal place of business in Los Angeles, California. (*Id.* ¶ 6.) Defendant IFG has done business under various names, including We Cosign USA. (*Id.*) Defendant Adams purports to be the CEO and President of We Cosign USA, and also a Director of Defendant IFG. (*Id.* ¶ 8.) Defendant Williams purports to be the CEO and President of We Cosign USA and Defendant Avila is the purported Vice President and Finance Director of We Cosign USA. (*Id.* ¶¶ 9–10.) Defendants Jones and Miller, both Nevada residents, are respectively the Secretary and President of Defendant IFG. (*Id.* ¶¶ 11–12.) Defendant ACG is an organization engaged in commercial activity in California. (*Id.* ¶ 7.) Furthermore, Defendants engaged in all relevant acts jointly, and there is a unity of interest and ownership among the corporations and individuals. (*Id.* ¶¶ 14, 41.)

Sometime prior to July 21, 2010, Defendants arranged for virtual office services at two locations in Los Angeles, California and one location in New York, New York, and arranged for the use of post office boxes in Woodland Hills, California and in La Jolla, California. (*Id.* ¶ 19.) Defendants also registered several domain names, including <inscorefunding.com> ("the Inscore Domain"), <ifgexec.com> ("the IFG Domain"), <wecosignusa.com> ("the Wecosign USA Domain"), and <cosignusa.com> ("the Cosign USA Domain"). (*Id.* ¶¶ 20, 22, 24, 26.) When registering each of these domains, Defendants provided materially false contact information to the domain name registrar. (*Id.*) At the Inscore Domain and the IFG Domain, Defendants operated commercial websites advertising and soliciting their financial services under the mark "We Co-Sing [sic]." (*Id.* ¶¶ 21, 23.) Defendants also began operating a commercial website at the Wecosign USA Domain, advertising and soliciting their financial services under the mark "WE COSIGN USA." (*Id.* ¶ 25.) Defendants diverted traffic from the Cosign USA Domain to the Wecosign USA Domain. (*Id.* ¶ 27.)

Beginning in June or July 2010, Defendants began advertising and solicitation of their financial services on the Internet under various marks confusingly similar to the Mark, including on Craigslist.org, Twitter.com, Corkin.com, ListOwn.com, Daype.com, and AdsInUSA.com. (*Id.* ¶ 28.) These advertisements either directed potential consumers to the Wecosign USA Domain or to contact Defendants directly. (*Id.*) Defendants undertook this advertising without Plaintiff's permission or authorization, and intended to cause consumers and potential consumers to believe that Defendants' financial services are associated with Plaintiff when they are not. (*Id.* ¶¶ 30, 34.) Furthermore, Defendants had actual knowledge of Plaintiff's prior use of and rights in the Mark. (*Id.* ¶ 39.)

## II. Procedural Background

On August 9, 2010, Plaintiff filed a Complaint asserting seven claims: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) federal false designation of

origin under 15 U.S.C. § 1125(a); (3) federal cyberpiracy under 15 U.S.C. § 1125(d)(1)(A); (4) unfair competition under Cal. Bus. & Prof.Code §§ 17200, *et seq.*; (5) common law unfair competition under California law; (6) federal racketeering activity under 18 U.S.C. § 1962(c); and (7) conspiracy to commit federal racketeering activity under 18 U.S.C. § 1962(d). (Compl.) On September 1, 2010, Defendant IFG and Defendant Adams filed an Answer to Plaintiff's Complaint. None of the other Defendants filed an Answer. Therefore, at Plaintiff's request, the Clerk entered the Default of the six other Defendants: ACG, Williams, Avila, Jones, Miller, and Walker. (Entry of Default, Doc. 31.)

Despite filing an Answer, Defendants IFG and Adams failed to mount a defense, or participate in discovery. (Mem. of P & A at 3.) Accordingly, on July 22, 2011, Plaintiff filed a Motion for Entry of Default of IFG and Adams. (Motion for Entry of Default, Doc. 56.) On August 10, 2011, the Court granted Plaintiff's Motion for Entry of Default of Defendants IFG and Adams. (Order Granting Plaintiff's Motion for Entry of Default, Doc. 67.) In the same Order, the Court also set forth a procedure for Plaintiff to provide notice to Defendants of Plaintiff's Motion for Entry of Default Judgment. (*Id.* at 2–3.) Specifically, the Court required Plaintiff to transmit, via United States Certified Mail, its motion and all supporting papers to Defendants at the addressed listed in the Order at least three Court days before filing the motion. (*Id.*) The Court also required that, at least three Court days before filing the motion, Plaintiff publish notice of its motion to Defendants for one day in *The Los Angeles Times* and one day in *The Las Vegas Review–Journal.* (*Id.*)

### III. Legal Standard

■ Under Rule 55 of the Federal Rules of Civil Procedure, default judgment is a two-step process. *See* Fed.R.Civ.P. 55; *see also Eitel v. McCool,* 782 F.2d 1470, 1471 (9th Cir.1986). Prior to entry of default judgment, there must be an entry of default. *See* Fed.R.Civ.P. 55. Upon entry of default, the factual allegations of the complaint, save for those concerning damages, are deemed to have been admitted by the defaulting party. Fed. R.Civ.P. 8(b)(6); *See Geddes v. United Fin. Grp.,* 559 F.2d 557, 560 (9th Cir.1977). "On the other hand, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *United States v. Cathcart,* No. C 07–4762 PJH, 2010 WL 1048829, at *4 (N.D.Cal. Feb. 12, 2010). "[I]t follows from this that facts ... not established by the pleadings of the prevailing party, or claims ... not well-pleaded, are not binding and cannot support the judgment." *Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir.1978).

■ A district court has discretion to grant or deny a motion for default judgment. *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980). The Ninth Circuit has set out seven factors to be considered by courts in reviewing a motion for default judgment: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel,* 782 F.2d at 1471–72.

■ "If the court determines that the allegations in the complaint are sufficient to establish liability, it must then determine the 'amount and character' of the relief that should be awarded." *Landstar*

*Ranger, Inc. v. Parth Enters., Inc.,* 725 F.Supp.2d 916, 920 (C.D.Cal.2010) (quoting 10A Charles Alan Wright, Arthur R. Miller, & May Kay Kane, *FEDERAL PRACTICE AND PROCEDURE* § 2688, at 63 (3d ed.1998)). This is because the allegations of the amount of damages suffered are not necessarily taken as true. *Geddes,* 559 F.2d at 560.

 Accordingly, the Court may hold a hearing to determine the amount of damages. Fed.R.Civ.P. 55(b)(2)(B). Under Ninth Circuit law, "[i]t is well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler,* 650 F.2d 1154, 1161 (9th Cir.1981). However, a "hearing" under this rule need not include live testimony, but may instead rely on declarations submitted by the parties, so long as notice of the amount requested is provided to the defaulting party. C.D. Cal. R. 55–2.

## IV. Discussion

### a. Allegations and Substantive Merits of Claims

### i. Trademark Infringement, False Designation of Origin, and Unfair Competition

 To assert a claim for trademark infringement, Plaintiff must show that Defendants are using: (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without Plaintiff's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods or services; (5) where such use is likely to cause confusion, or to cause a mistake or to deceive. 15 U.S.C. § 1114(1)(a); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir.1988). Although there are some differences between a claim under § 1114

(trademark infringement) and § 1125(a) (false designation of origin), "the analysis under the two provisions is oftentimes identical." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1047 n. 8 (9th Cir.1999). Furthermore, the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims under the Lanham Act." *Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir. 1994). Therefore, the Court jointly analyzes Plaintiff's trademark infringement, false design of origin, state statutory unfair competition, and state common law unfair competition claims.

 The key inquiry under a trademark infringement claim is "whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 632 (9th Cir. 2008) (citation and internal quotation marks omitted). The Ninth Circuit has "developed eight factors, the so-called *Sleekcraft* factors, to guide the determination of a likelihood of confusion." *GoTo. Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000). These factors are "(1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of [Plaintiff's] mark; (5) [Defendants'] intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers." *Id.* "In the context of the Web in particular, the three most important *Sleekcraft* factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel."

*Id.* (citation and internal quotation marks omitted). Additionally, "proof of intent to cause confusion is entitled to *great weight.*" *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1052 n. 11 (9th Cir.1998).

 Overall, the application of the *Sleekcraft* factors to the allegations in Plaintiff's Complaint, taken as true, suggest a high likelihood of confusion. The marks used by Defendants in connection with their services, including "WE CO-SING [sic]" and "WECOSIGNUSA" are nearly identical to the Mark. In fact, the former appears to be a typo of the Mark, and the latter simply appends "USA" to the Mark. Both Plaintiff and Defendants use the internet as their primary marketing channel, and both offer financial services under their respective marks. Furthermore, Defendants use the marks in an attempt to cause consumers to believe that Defendants' financial services are associated with Plaintiff. Based only on the allegations of the Complaint, the three most important *Sleekcraft* factors in the context of internet infringement, together with Defendants' intent to cause confusion, suggest a high likelihood of confusion. Therefore, the Court concludes that Plaintiff has adequately pled its trademark infringement claim, and is likely to succeed on the merits.[1] Therefore, Plaintiff is entitled to entry of default on its trademark infringement, false designation of origin, and state statutory and common law unfair competition claims.

### ii. *Cyberpiracy*

 To prevail on a claim for cyberpiracy, Plaintiff must prove that "(1) the [D]efendant[s] registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acts with 'bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1218–19 (9th Cir.2010) (quoting 15 U.S.C. § 1125(d)(1)(A)). Here, Plaintiff has alleged that Defendants registered and operated a website under the domain name <wecosignusa.com>, which is confusingly similar to the Mark, as noted above. Furthermore, Plaintiff alleges that Defendants' registration of the WecosignUSA Domain was done in bad faith with the intention to profit from Plaintiff's Mark. (*Id.* ¶ 60.) Moreover, Plaintiff specifically alleges that Defendants knowingly provided false contact information to the domain name registrar, which is a statutory factor for bad faith intent. (*Id.* ¶¶ 20, 22, 24, 26.) *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VII) (listing "the person's provision of material and misleading false contact information when applying for the registration of the domain name" as a factor in establishing bad faith intent). Therefore, the Court concludes that Plaintiff's cyberpiracy claim is adequately pled, and taking the allegations as true, Plaintiff would be likely to succeed on the merits. Accordingly, Plaintiff is entitled to the entry of default judgment on its cyberpiracy claim.

### iii. *Civil RICO*

 "Liability under RICO ... requires (1) the conduct (2) of an enterprise

---

1. Plaintiff also provides additional evidence of its likelihood of success on the merits. For example, Walker stated that Defendant Adams was aware of Plaintiff and its use of the Mark from "[p]retty much the beginning" and had visited Plaintiff's website prior to using the various marks. (Walker Decl., Ex. F at 13:24, Doc. 79–1; Holcomb Decl. ISO Default J., Ex. O at RFA 181, Doc. 80.) Additionally, Plaintiff submits evidence of actual consumer confusion based on the receipt by Plaintiff of calls from potential customers confused about the connection between Plaintiff and Defendants. (Jakubaitis Deck ¶¶ 12–14, Doc. 78.)

(3) through a pattern (4) of racketeering activity." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir.1996). A "pattern of racketeering activity" requires at least two predicate acts. *Clark v. Time Warner Cable*, 523 F.3d 1110, 1116 (9th Cir.2008). Here, Plaintiff asserts the predicate acts of wire fraud, 18 U.S.C. § 1343, and trafficking in counterfeit services, 18 U.S.C. § 2320. (Compl.¶¶ 77–82.) Both of these acts are cognizable RICO predicates. *See* 18 U.S.C. § 1961. However, the Court concludes that Plaintiff fails to state a claim for wire fraud and, therefore, cannot show a pattern of racketeering activity.

 The main allegation underlying Plaintiff's assertion of wire fraud by Defendants is that "Defendants devised a scheme or artifice to solicit payment from others for counterfeit services through Defendants' infringing use of a counterfeit mark, which created confusion or mistake or deceived others regarding the source or origin of Defendants' purported services." (Compl.¶ 77.) This is simply a restyling, if not purely a reiteration, of Plaintiff's trademark infringement and false designation of origin claims. However, trademark infringement and false designation of origin are not cognizable RICO predicates. *See Smith*, 84 F.3d at 1217 ("Because appellants' RICO counts do no more than allege copyright infringement under the label of mail and wire fraud, and copyright infringement is not a predicate act under RICO, the district court properly concluded that appellants failed to state a claim."); *see also Naso v. Park*, 850 F.Supp. 264,

274–75 (S.D.N.Y.1994) (concluding that an allegation of patent infringement and false designation of origin is insufficient to state a claim for mail fraud without additional allegations of misrepresentation or omission or plan to fraudulently deprive of their property).[2] Therefore, the Court concludes that Plaintiff fails to adequately plead a claim for violation of RICO. Furthermore, "[b]ecause [the Court] conclude[s] that [Plaintiff] fails to plead a proper RICO claim ..., discussion of [Plaintiff's] conspiracy claim is unnecessary." *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 619 n. 1 (9th Cir.2004). Accordingly, Plaintiff is not entitled to the entry of default on its RICO and RICO conspiracy claims. *See Ringcentral, Inc. v. Quimby*, 711 F.Supp.2d 1048, 1058 (N.D.Cal.2010) ("[W]here the allegations in a complaint are not 'well-pleaded,' liability is not established by virtue of the defendant's default and default judgment should not be entered.").

#### b. Remaining Eitel Factors

#### i. Prejudice to the Plaintiff

 Plaintiff would suffer prejudice if the Court does not grant its motion for the entry of default judgment because it has no other means of recourse. Five of the Defendants have failed to appear in or otherwise defend this action at all, and two of the Defendants initially appeared but then withdrew their participation in this action. Therefore, this factor weighs in favor of the entry of default judgment.

---

**2.** The Court notes that Plaintiff submits evidence that Defendant Adams intended to divert traffic from Plaintiff's website. (Holcomb Decl. ISO Default J., Ex. O at RFA 47.) Plaintiff also submits evidence that Adams "agreed with another person to collect application fees and payment for financial services offered under the mark WE COSIGN USA while intending that no financial services

would actually be rendered." (*Id.* at RFA 253.) However, allegations as to these facts were not included in the Complaint, and therefore, Plaintiff fails to state a claim for mail fraud. Furthermore, Plaintiff asserts RICO claims against all Defendants, but provides evidence of this sort only as to Defendant Adams.

#### ii. Sum of Money at Stake

■ "[This] Eitel factor examines the amount of money at stake in relation to the seriousness of a defendant's conduct." Craigslist, Inc. v. Naturemarket, Inc., 694 F.Supp.2d 1039, 1060 (N.D.Cal.2010). Plaintiff requests a permanent injunction, $687,000 in treble damages for its trademark infringement claims, $100,000 in statutory damages for cyberpiracy, and attorneys' fees and costs of $236,151.27. (Mem. of P. & A. at 17–22.) Even if the Court were to grant Plaintiff's total requested monetary award of $1,023,151.27, such an award would be consistent with other default judgment awards in the context of trademark infringement. Craigslist, 694 F.Supp.2d at 1060 (holding that this factor weighed in favor of default judgment where plaintiff asserted copyright, trademark, breach of contract, and fraud claims and sought damages in the range of $1,177,827.07 to $4,900,327.07). Accordingly, this factor weighs in favor of default judgment.

#### iii. Dispute Concerning Material Facts

■ "[This] Eitel factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case." Craigslist, 694 F.Supp.2d at 1060. Where a plaintiff has filed a well-pleaded complaint, the possibility of dispute concerning material facts is remote. See, e.g., Landstar Ranger, 725 F.Supp.2d at 921–22 ("Since [plaintiff] has supported its claims with ample evidence, and defendant has made no attempt to challenge the accuracy of the allegations in the complaint, no factual disputes exist that preclude the entry of default judgment."). Moreover, the possibility of dispute concerning material facts is further diminished as to Defendants Adams and IFG, given their early participation in this matter and subsequent failure to contest Plaintiff's claims.

Additionally, Walker reached out to Plaintiff's counsel in an attempt to exonerate herself because she had been unaware of the unlawful activities of Defendants Adams and IFG alleged in the Complaint. (Walker Decl. ¶ 7, Doc. 79.) While this suggests that other individual Defendants may have been similarly unaware of the activities of Defendants Adams and IFG, no other Defendant has made any attempt to defend itself. Therefore, the Court concludes that while not entirely remote, the possibility of a dispute concerning material fact with respect to Defendants ACG, Williams, Jones, Avila, and Miller is low. Accordingly, this factor weighs in favor of the entry of default.

#### iv. Excusable Neglect

■ This "factor considers whether defendant's default may have been the product of excusable neglect." Landstar Ranger, 725 F.Supp.2d at 922. This factor favors default judgment when the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit. See id. (concluding that this factor favored default judgment and "possibility of excusable neglect is remote" where defendant had been properly served); Craigslist, 694 F.Supp.2d at 1061 ("Plaintiff has proffered evidence showing Defendants were clearly aware of the pending litigation."). Here, Defendants Adams and IFG were properly served and initially participated in this litigation, and thus, their default did not occur because of excusable neglect. (See [Stricken] Answer, Doc. 17.) The five remaining Defendants were properly served with process (see Holcomb Decl. ISO Entry of Default ¶ 4, Doc. 22), and all Defendants were provided notice of Plaintiff's entry of default via United States Certified Mail and through publication of notice in

*The Los Angeles Times* and *The Las Vegas Review–Journal,* in accordance with this Court's Order. (Holcomb Decl. ISO Default J. ¶¶ 16–17.) Accordingly, the Court concludes that the possibility of excusable neglect is small, and this factor favors the entry of default.

### v. *Policy Favoring Decision on the Merits*

██ "The final *Eitel* factor examines whether the strong policy favoring deciding cases on the merits prevents a court from entering default judgment." *Craigslist,* 694 F.Supp.2d at 1061. Although, "[c]ases should be decided upon their merits whenever reasonably possible," *Eitel,* 782 F.2d at 1472, "Rule 55(a) allows a court to decide a case before the merits are heard if defendant fails to appear and defend." *Landstar Ranger,* 725 F.Supp.2d at 922. Notwithstanding the strong policy presumption in favor of a decision on the merits, where a defendant fails to appear and respond as occurred here, a decision on the merits is impossible and default judgment is appropriate. *See Craigslist,* 694 F.Supp.2d at 1061. Thus, this factor weighs in favor of default judgment.

## V. Remedies

### a. *Permanent Injunction*

Plaintiff seeks to permanently enjoin Defendants from the following:

i. using the Mark or any mark confusingly similar thereto to promote, offer, render, advertise, or identify any financial services or related goods or services in such a way that would be likely to cause confusion, to cause mistake, or to deceive, or otherwise to create the impression that Defendants' goods or services originate from Plaintiff, are endorsed by Plaintiff, or are connected in any way with Plaintiff;

ii. otherwise infringing the Mark;

iii. registering any domain name or names identical or confusingly similar to the Mark;

iv. falsely designating the origin of Defendants' services;

v. using in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact that is likely to cause confusion, to cause mistake, or to deceive regarding the origin, sponsorship, or approval of Defendants' services or falsely to imply a connection or affiliation with Plaintiff or Plaintiff's WECOSIGN services;

vi. unfairly competing with Plaintiff in any manner whatsoever;

vii. causing likelihood of confusion or injuring Plaintiff's business reputation; and

viii. associating together to offer financial guaranty services or to engage in the same type of endeavor as the Enterprise has engaged in.

(Compl. at 20–21, ¶ H.)

██ Under the Lanham Act, "the district court [has] the 'power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right' of the trademark owner." *Reno Air Racing Ass'n v. McCord,* 452 F.3d 1126, 1137 (9th Cir.2006) (citing 15 U.S.C. § 1116(a)). In fact, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp.,* 846 F.2d at 1180. In order for the

Court to grant a permanent injunction, Plaintiff must demonstrate: (1) actual success on the merits; (2) a likelihood of irreparable injury if injunctive relief is not granted; (3) a balance of hardships favoring Plaintiff; and (4) that an injunction will advance the public interest. *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

 Here, Plaintiff has demonstrated actual success on the merits of its trademark infringement and cyberpiracy claims. If an injunction were not granted, Plaintiff would suffer irreparable injury from the ongoing damages to its goodwill and diversion of customers to counterfeit services. Furthermore, the balance of hardships favors Plaintiff because without an injunction, Plaintiff will lose profits and goodwill, while an injunction will only proscribe Defendants' infringing activities. Finally, an injunction is in the public interest because "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties West, Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 n. 5 (9th Cir.2009).

Accordingly, the Court concludes that Plaintiff is entitled to a preliminary injunction as requested, with the exception that the last term (viii) referring to "the Enterprise" is excluded. The inclusion of this term is dependent on the Court's entering default judgment as to Plaintiff's RICO claims, which it declined to do.

### b. *Damages*

 The Lanham Act provides that, subject to the principles of equity, a trademark owner may "recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Additionally, the Court may enter judgment for any sum up to three times the amount found as actual damages. *Id.* Here, Plaintiff seeks to recover actual damages in the amount of $229,000, including $25,000 in Defendants' profits and $204,000 in lost profits, which it asserts should be trebled. (Mem. of P. & A. at 20.) However, "recovery of both plaintiff's lost profits *and* disgorgement of defendant's profits is generally considered a double recovery under the Lanham Act." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (9th Cir.1994). Therefore, the Court will not award both Plaintiff's lost profits and Defendants' profits.

 "As a general rule, damages which result from a tort must be established with reasonable certainty.... Damages are not rendered uncertain because they cannot be calculated with absolute exactness, yet, a reasonable basis for computation must exist." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993) (internal quotation marks omitted). Furthermore, courts have accepted less precise estimates of damages where a defendant frustrates the discovery of a precise amount by defaulting in the action. *See Taylor Made Golf Co. v. Carsten Sports, Ltd.*, 175 F.R.D. 658, 662 (S.D.Cal.1997).

With respect to Defendants' profits, Plaintiff is required to prove only sales; had Defendants mounted a defense, they would have carried the burden of showing deductions. 15 U.S.C. § 1117(a). In her declaration, Walker stated that Defendants Adams and IFG received at least $25,000 in revenue from at least four customers. (Walker Decl. ¶¶ 5–6.) Given the fact that Defendants have frustrated Plaintiff's ability to determine with any precision the amount of their sales and considering the circumstances of Defendants' operation, the Court concludes that Plaintiff has established $25,000 as an appropriate measure of Defendants' profits.

As a measure of its lost profits, Plaintiff submits the declaration of its General

Manager, Frank Jakubaitis, which states that from 2005 to 2010, Plaintiff experienced a 20% growth in business per year on average. (Jakubaitis Decl. ¶ 25.) In early-to-mid 2010, Plaintiff had sales revenue of approximately $115,000 and profits of approximately $76,000. (*Id.*) Then, from July 2010, when Defendants began their infringing activity, to December 2010, Plaintiff's sales revenues decreased by 65%. (*Id.*) Based on these numbers, Mr. Jakubaitis estimates that Plaintiff lost $300,000 in revenue, or about $204,000 in profits. (*Id.*)

While the Court recognizes that "[Defendants'] wrong made it impossible to know with any precision what [Plaintiff's] sales would have been had [Defendants'] not committed their wrong," *DSPT Int'l*, 624 F.3d at 1223, Plaintiff has failed to provide the type of financial statements listing detailed information on sales, expenses, and profits that would allow the Court to conclude that Plaintiff's estimate is reasonable. *See id.* at 1222; *see also Ringcentral*, 711 F.Supp.2d at 1062 (concluding that plaintiff requesting default had not provided a reasonable basis for computation of its lost profits because plaintiff failed to provide a reasonable baseline). In fact, Mr. Jakubaitis' declaration omits several details regarding the methodology that led him to estimate a loss of $204,000 in profits based on an estimated loss $300,000 in sales. For example, by the Court's calculation, using the revenue-to-profit ratio generated in the first half of 2010, revenue of $300,000 corresponds to profits of approximately $198,000. While this is only a difference of $6,000, it demonstrates the gaps in financial information presented to the Court. Additionally, Mr. Jakubaitis' states that "in early-to-mid 2010, Plaintiff had sales revenues of approximately $115,000 . . . ." (Jakubaitis Decl. ¶ 25.) However, it is unclear whether this figure is year-to-date, the highest grossing month, or something else altogether. Furthermore, these missing details are presumably within the control and possession of Plaintiff. Accordingly, the Court cannot determine an appropriate measure of Plaintiff's lost profits at this time.

As discussed above, Plaintiff may not recover its own lost profits in addition to the disgorgement of Defendants' profits. Plaintiff has established the appropriate measure of Defendants' profits, but has failed to show a reasonable measure of its lost profits. The Court will give Plaintiff the opportunity to submit further evidence of the basis for its "lost profits" damages no later than February 13, 2012. Failure to do so will result in denial of that request. Furthermore, the Court will determine the reasonableness of trebling or otherwise increasing damages based on either Defendants' profits or Plaintiff's lost profits once it is in receipt of all of the lost profits evidence.

#### c. *Statutory Damages*

■ The Lanham Act provides for statutory damages for cyberpiracy violations under 15 U.S.C. § 1125(d)(1) in an amount of $1,000 to $100,000 per domain name. 15 U.S.C. § 1117(d). A prevailing plaintiff may recover statutory damages under this provision in addition to actual damages for infringement of its trademark. *See St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1206 (11th Cir.2009) ("We agree and conclude that [a cyberpiracy] statutory damages award, which serves as a sanction to deter wrongful conduct, is not duplicative of a service mark infringement actual damages award, which serves to compensate a plaintiff for his injuries."). *But see Media Lab, Inc. v. Collis*, No. C08–04732 HRL, 2010 WL 3893582, at *6 (N.D.Cal. Sept. 30, 2010) (denying plaintiff's request for actual

damages in addition to statutory damages for cyberpiracy where the claims were based on the same underlying conduct).

 To determine a reasonable amount of statutory damages, "courts generally consider a number of factors ..., including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter ... and other behavior by the defendant evidencing an attitude of contempt towards the court of the proceedings." *Verizon California, Inc. v. Onlinenic, Inc.*, No. C 08–2832 JF (RS), 2009 WL 2706393, at \*3 (N.D.Cal. Aug. 25, 2009). Here, Defendants provided false contact information to the domain name registrar, but Plaintiff produces no additional evidence to support a maximum statutory damages award. Therefore, the Court concludes that $50,000 is an appropriate award.

#### d. *Attorneys' Fees*

 "An award of reasonable attorneys' fees and costs is expressly provided for in 'exceptional cases' of trademark infringement." *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir.2008) (citing 15 U.S.C. § 1117(a)). "While the term 'exceptional' is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *Id.* (citation and internal quotation marks omitted). In the context of a default judgment, the Ninth Circuit has upheld awards of attorneys' fees "solely because, by entry of default judgment, the district court determined, as alleged in [plaintiff's] complaint, that [defendant's] acts were committed knowingly, maliciously, and oppressively, and with an intent to ... injure [plaintiff]." *Id.* (citation and

internal quotation marks omitted). Here, Plaintiff alleged that Defendants' acts were "willful and deliberate." (Compl.¶ 40.) Accordingly, the Court concludes that Plaintiff is entitled to attorneys' fees.

Having reviewed the invoices provided by Plaintiff, the Court finds that the time spent was reasonable. The Court also finds the rates charged by Plaintiff's counsel to be reasonable, particularly in light of the complexity of this case and the fact that Defendants Adams and IFG initially appeared in the case. Therefore, Plaintiff's request for $222, 946 in attorneys' fees is granted.

#### e. *Costs*

Because Plaintiff prevailed on its false designation of origin claim, it is entitled to the costs of the action. 15 U.S.C. § 1117(a). In accordance with Local Rule 54–3, Plaintiff may submit a Bill of Costs and a Notice of Application to the Clerk to Tax Costs to recover the costs of this action. C.D. Cal. R. 54–3.

### VI. Conclusion

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Default Judgment. Accordingly:

i. The Judgment is GRANTED as to all Defendants with respect to the following claims: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) federal false designation of origin under 15 U.S.C. § 1125(a); (3) federal cyberpiracy under 15 U.S.C. § 1125(d)(1)(A); (4) unfair competition under Cal. Bus. & Prof. Code §§ 17200, *et seq.;* (5) common law unfair competition under California law.

ii. The Judgment is DENIED as to all Defendants with respect to the fol-

lowing claims: (1) federal racketeering activity under 18 U.S.C. § 1962(c); and (2) conspiracy to commit federal racketeering activity under 18 U.S.C. § 1962(d).

iii. Defendants are permanently enjoined from the activities enumerated in Plaintiff's requested injunction, with the exception of the last term (viii), as set forth in this Order.

iv. The Court defers a ruling on Plaintiff's request for actual damages, as set forth in this Order.

v. Plaintiff is awarded $50,000 in statutory damages under § 1117(d).

vi. Plaintiff's is entitled to attorneys' fees in the amount of $222,946.

vii. Plaintiff may submit a Bill of Costs and a Notice of Application to the Clerk to Tax Costs to recover the costs of this action.