**DIGBY ADLER GROUP LLC, Plaintiff,**

v.

**IMAGE RENT A CAR, INC., et al., Defendants.**

Case No. 10-cv-00617-SC

United States District Court, N.D. California.

Signed February 6, 2015

Karl Stephen Kronenberger, Jeffrey Michael Rosenfeld, Kronenberger Rosenfeld, LLP, San Francisco, CA, Conor Hughes Kennedy, Whitestone, NY, for Plaintiff.

Steven Heath, Heath and Steinbeck LLP, Santa Monica, CA, for Defendants.

*ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT*

SAMUEL CONTI, UNITED STATES DISTRICT JUDGE

## I. *INTRODUCTION*

Now before the Court are two motions for summary judgment. One is brought by Plaintiff Digby Adler Group, LLC. ECF No. 122 ("Pl.'s Mot."). The other is brought by Defendant Gad Sebag. ECF No. 134 ("Sebag Mot."). Both motions are

fully briefed,[1] and the Court deems them suitable for disposition without oral argument pursuant to Civil Local Rule 7–1(b). For the reasons set forth below, Plaintiff Digby Adler Group, LLC's motion for summary judgment is GRANTED in part and DENIED in part, and Defendant Gad Sebag's motion for summary judgment is DENIED.

## II. *BACKGROUND*

### A. *Factual Background*

Plaintiff Digby Adler Group, LLC ("Digby") has operated a van rental service under the name Bandago, LLC ("Bandago") through its website, bandago.com, since 2003. ECF No. 124 ("Laguana Decl.") ¶¶ 1–2. On August 31, 2010, the United States Patent and Trademark Office ("PTO") issued federal trademark registration number 3839689 to Digby for the BANDAGO mark. ECF No. 123 ("Rosenfeld Decl.") Ex. 18.

The defendants in this matter are two individuals—Gad Sebag and Schneior Zilberman—and two companies—Image Rent A Car, Inc. ("Image") and Van Rental Co., Inc. ("Van") (Van and Image will be referred to collectively as the "Corporate Defendants"). Mr. Zilberman operated a third rental car company called Adir Rent A Car, Inc., from 1996 through 2004. ECF No. 129 ("Zilberman Decl.") ¶¶ 3–8. Adir folded in 2004, when a dispute with the car dealership that supplied its inventory resulted in the supplier refusing to let Adir use its cars. *Id.* ¶¶ 6–8. Mr. Zilberman's personal finances and credit were seriously damaged in the process. *Id.* ¶ 9.

So Mr. Zilberman approached Mr. Sebag—his brother-in-law—asking for financial assistance to start a new company. *Id.* ¶ 9. Mr. Sebag agreed to form a rental car company, serve as its CEO, loan money to the company, and allow Mr. Zilberman to use his credit rating to obtain cars. ECF No. 130 ("Sebag Decl. I") ¶¶ 7, 9). However, according to both Mr. Sebag and Mr. Zilberman, Mr. Zilberman alone would control all of the company's operations. *Id.*; Zilberman Decl. ¶¶ 14, 17–19.

In October 2004, Defendant Image Rent A Car, Inc. ("Image") was incorporated under the law of New York State. ECF No. 21–4 ("Sebag Decl. II") at 1. Mr. Sebag filed for incorporation and was the company's CEO (though the corporate record kept by the New York Department of State reflects the name "Gao Sebaf") and sole shareholder; he also described Image as "my company." ECF No. 137 Ex. 13 at 16[2]; Rosenfeld Decl. Exs. 16, 42 at 14:3–11 (Sebag "owned and initiated [Image and Van]"), 44 at 30:10–13. Defendant Shneior Zilberman served as Image's general manager. *Id.* Ex. 2 at 1. Image operated a car and van rental service primarily in New York, though it also had offices in Florida. *Id.* Image marketed its rental service through its website, imagerentacar.com. *Id.* Exs. 45 at Responses 19–20. Image's bylaws were simply blank form bylaws, without even the name of the corporation filled in. ECF No. 137 Ex. 13 at 17–66. Though the bylaws require a board of directors with at least three directors, Image never had a board of directors. *Id.*

---

**1.** ECF Nos. 128 ("Defs.' Opp'n"), 135 ("Pl.'s Reply"), 142 ("Pl.'s Opp'n"), 144 ("Sebag Reply").

**2.** Plaintiff's initial filing of the Rosenfeld Declaration (ECF No. 123) included an exhibit that failed to redact certain personal information. Pursuant to the Court's order, the initial filing was expunged from the record and replaced with a properly redacted version. *See* ECF Nos. 138, 141. As a result, exhibits 11–13 of the Rosenfeld Declaration have a different electronic court filing number than the other 56 exhibits.

Ex. 13 at 2. Nor do Image's records indicate that it ever held shareholder meetings or keep corporate minutes. *Id.* Ex. 13 at 2, 15–66.

Defendant Van Rental Co., Inc. ("Van") was incorporated under the law of New York State in July 2007. Rosenfeld Decl.*d.* Ex. 17. Initially founded with the objective of expanding Image's business into new areas, Van was defunct almost from the start and never actually operated. *Id.* Ex. 42 at 4:6–19, 5:6–12. Mr. Sebag was Van's CEO and sole shareholder. *Id.* Exs. 1 at 1, 42 at 14:3–11. Mr. Zilberman, who served as Van's president, recalls that Van either owned "none or very few" vehicles. *See Id.* Exs. 26 at 3, 42:14–19. Van's finances were run through Image, and the two companies operated essentially as one entity. Rosenfeld Decl. Ex. 42 at 8:14–18, 10:3–4.

In August of 2008, Van registered the domain namebandago.net (recall that Digby's website wasbandago.com). *Id.* Ex. 7 at 6; Ex. 31. Though the account with the domain registrar listed Van as the owner, the contact email address supplied wasinfo@imagerentacar.com. *Id.* Ex. 31 at 3. There was no website at bandago.net; the site simply redirected visitors to Image's website. Sebag Decl. II at 2. In addition to registering the bandago.com domain, Defendants bid on the Google AdWords search terms "bandago," "bandago van rental," and "bandago van rentals" (the "Bandago Search Terms"). Rosenfeld Decl. Ex. 23. Google AdWords is a service that lets customers bid on certain search terms, so that the customer's website will show up as advertisement when Google visitors search for those terms. Defendants paid for advertisements that would direct users to Image's website when they searched for the Bandago Search Terms. *Id.* Ex. 24. The Google AdWords account was registered in Mr. Sebag's name, but

Mr. Zilberman operated the account. *Id.* Exs. 9 at 2, 35.

On July 1, 2007, Digby's CEO, Sharky Laguana, created content for the Bandago website. The text on the website described Bandago's vans and rental services. Laguana Decl. ¶ 11, Ex. 3. Digby applied for a copyright registration to cover the text of the website, and the PTO granted the registration on January 31, 2011. Rosenfeld Decl. Exs. 19–20. Virtually identical text (sometimes modified very slightly to reflect Image's name and locations) appeared on Image's website. *See id.* Exs. 52–59.

On April 27, 2010, Philippe Naim (Mr. Sebag's uncle) formed a corporation called Group Travel Solution, Inc. ("GTS"). *Id.* Exs. 49 at 8:6–23; 60. Mr. Naim recalls that GTS purchased Image's assets, including vehicles, phones, and websites. *Id.* Ex. 49 at 9:2–4. He does not recall exactly how many vehicles GTS purchased, but guesses that the number was "[b]etween fifty and sixty." *Id.* at 9:5–11. Digby asserts that GTS purchased 78 cars for one dollar each. *See* Pl.'s Mot. at 10. In support, Digby cites to GTS' 2010 tax returns—a 39–page exhibit—with no pincite or explanation. But those returns indicate only that GTS owned some large number of vehicles, and the tax returns do not indicate the vehicles' source or sources. *See* Rosenfeld Decl. Ex. 50 (filed under seal) at 11, 16–19, 22–27, 37–38. GTS' tax returns do, however, reflect the sale of 20 of the vehicles, and the sale prices and proceeds show that each was originally acquired for $1. *See id.* at 11, 24–27. On March 24, 2011, Van and Image filed for bankruptcy. *Id.* Exs. 25–26.

### B. *Procedural History*

This case was filed on February 11, 2010. *See* ECF No. 1 ("Compl."). The transfer of assets described above there-

fore took place after the filing of this lawsuit but before Van and Image declared bankruptcy. When the Corporate Defendants filed for bankruptcy, the Court stayed this case pending the outcome of the bankruptcy proceedings. *See* ECF No. 90 ("Stay Order"). On May 23, 2014, the bankruptcy court dismissed both bankruptcy proceedings. *See* ECF No. 96 Exs. A–B. On June 16, 2014, the Court granted Digby's unopposed motion to lift the stay. *See* ECF No. 97. Digby then moved for summary judgment, alleging that Mr. Sebag and Mr. Zilberman are personally liable for Van and Image's actions because all defendants are alter egos of one another and because officers and directors of a corporation are liable for torts they authorize or in which they participate. Pl.'s Mot. at 19–21.

Defendants opposed the motion, but they conceded that the Corporate Defendants are liable for trademark and copyright infringement. They also concede two of the elements of cybersquatting. *See* Defs.' Opp'n at 1. However, Defendants argue that Mr. Sebag and Mr. Zilberman are not alter egos of Van or Image and that Mr. Sebag is not personally liable as an officer or director. Mr. Sebag then moved for summary judgment on the grounds that he cannot be held liable for the Corporate Defendants' actions. *See* Sebag Mot.

## III. *LEGAL STANDARD*

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be granted if the evidence would require a directed verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burdens of production and persuasion. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

## IV. *DISCUSSION*

The Court begins with a discussion of the Corporate Defendants' liability, and then proceeds to analyze whether Mr. Sebag or Mr. Zilberman may be held liable for the Corporate Defendants' actions.

### A. *The Corporate Defendants*

Defendants do not vigorously contest the allegations against the Corporate Defendants. In fact, Defendants concede liability as to the trademark infringement and copyright infringement claims. Defendants also concede that two of the three elements of Digby's cybersquatting claim are met, but they contest the third. The Court examines each cause of action in turn.

#### 1. *Trademark Infringement*

 "To establish a trademark infringement claim ..., [Digby] must establish that [Defendants are] using a mark confusingly similar to a valid, protectable trademark of [Digby's]." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999). It is undisputed that Digby has registered the Bandago mark. *See* Rosenfeld Decl. Ex. 18. Digby's "registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [Digby's] exclusive right to use the mark on the goods and services specified in the registration." *Id.* at 1047. Digby asserts that Defendants' registration of the bandago.net domain and bids on the Bandago-related Google AdWords constitute use of the Bandago mark. Defendants do not dispute that Van and Image's conduct constitute trademark infringe-

ment; in fact, Defendants concede that Van and Image are liable for infringement of Digby's mark. *See* Defs.' Opp'n at 1, 11–12. Accordingly, the Court finds Van and Image liable for trademark infringement. Digby's motion is GRANTED with respect to the allegations that Van and Image infringed upon Digby's trademark.

## 2. *Copyright Infringement*

 "A plaintiff who claims copyright infringement must show: (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.2004). "A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.'" *United Fabrics Int'l, Inc. v. C & J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir.2011) (quoting 17 U.S.C. § 410(c)). It is undisputed that Digby has a registered copyright for the text of the bandago.com website. *See* Rosenfeld Decl. Exs. 19–20. It is also undisputed that the Corporate Defendants used language copied almost verbatim from Digby's website on the Image website (though they did so before the copyright was registered). *See id.* Exs. 52–59. Once again, Defendants concede that Van and Image infringed upon Digby's copyright. *See* Defs.' Opp'n at 1, 11–12. The Court finds Van and Image liable for copyright infringement. Digby's motion for summary judgment is GRANTED with respect to the allegations that Van and Image infringed upon Digby's copyright.

## 3. *Cybersquatting*

██ "The Anti–Cybersquatting Consumer Protection Act ["ACPA"] establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010). Digby alleges that (1) Defendants registered and used thebandago.net domain name; (2) thebandago.net domain name is identical to the Bandago mark; and (3) that Defendants acted with bad faith intent to profit from that mark.

██ With respect to the cybersquatting claim, Defendants concede the first two elements: they admit that Van and Image registered thebandago.net domain name and that "bandago.net" is identical to Digby's Bandago mark. *See* Defs.' Opp'n at 9. However, Defendants allege that there is a genuine dispute of material fact regarding the bad faith requirement. The ACPA sets out nine factors to consider in determining whether an alleged cybersquatter acted in bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). But because the ACPA factors are permissive and not exhaustive, the Ninth Circuit has emphasized that courts "need not, however, march through the nine factors seriatim.... [I]nstead, the most important grounds for finding bad faith are the unique circumstances of the case...." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir.2009).

Nonetheless, the parties both discuss the ACPA factors, so it seems appropriate to begin the discussion there. Some of the factors are uncontroversial: it is undisputed, for example, that Defendants have no intellectual property rights to the Bandago mark, that bandago.net does not consist of Defendants' legal name, that Defendants never used the domain name in connection with the bona fide offering of any goods or services, and that Defendants never engaged in a bona fide noncommercial use of the mark in a site accessible under the

domain name. More importantly, it is clear that Defendants intended to divert consumers from Digby's website. Digby has shown that Defendants registered the-bandago.net domain name—which Defendants acknowledge is identical to Digby's Bandago mark—and set up that domain to redirect to Defendants' own website. Because Digby and Image were competing van rental companies, it is evident that this was an attempt to divert Digby's business. Sebag Decl. II at 2. Defendants do not contest this factor in their opposition brief. See Defs.' Opp'n at 10–11. Those factors, therefore, favor Digby. On the other hand, it also undisputed that Defendants never offered to sell or transfer the domain to Digby, so that factor favors Defendants. The parties dispute the remaining factors, so the Court will address each in turn.

The seventh bad faith factor is provision of misleading or false contact information. The bandago.net domain was registered to Van. Rosenfeld Decl. Ex. 31. Digby argues that Van was a fictitious entity designed only to shield Image from liability, and so the contact information was misleading because it concealed Image's involvement, even though it provided Image's true phone number, email, and address. See Digby Mot. at 14. However, Digby cites no authority in support of that interpretation of "misleading." Defendants emphasize that Van used its actual address. See Defs.' Opp'n at 10. Indeed, given that Digby previously argued that Van and Image shared a physical address, phone numbers, and email addresses, see Digby Mot. at 7, it seems that little concealment was actually involved. If this factor favors Digby at all, the Court assigns it very little weight.

The eighth bad faith factor is Defendants' registration of multiple domain names confusingly similar to others'

marks. Here, Digby points out that Defendants registered the domains whizzcarhire.com and albacarhire.com, which are similar to other car rental companies' internet domains. See Digby Mot. at 14–15. Defendants respond that Whizz Car appears to be located in Singapore, Alba Car appears to be located in Spain, and that Plaintiffs have provided no evidence that either company existed when Defendants registered those domains. Again, the Court finds that this factor is not terribly persuasive in this situation.

The ninth bad faith factor is the extent to which the mark at issue is or is not distinctive and famous. Defendants apparently acknowledge that the Bandago mark is distinctive, but they contest whether it is famous. See Defs.' Opp'n at 11. Once more, this factor is not very persuasive for either side.

Ultimately, the statutory factors are not hugely helpful in making a bad faith determination in this case, except for the intentional diversion factor. Five of the factors undeniably favor Digby; the sixth favors Defendants; and the last three are either neutral or not very important given the facts of this case. The Court finds that the most important factor in this case is the fifth: that Defendants intended to divert consumers from Digby's website. Combined with the first four factors, which establish that Defendants had no legitimate interest in using the Bandago mark, the intent to divert consumers is a powerful indication of Defendants' bad faith. However, that does not end the inquiry, as it is the broader circumstances of this case that finally resolve the issue.

In the cybersquatting context, the Ninth Circuit has held that the unique circumstances of the case are the most important consideration in determining bad faith. The most persuasive facts in this case are that Defendants not only registered a do-

main name that they admit was identical to the Bandago mark, but they bid on Google AdWords to redirect consumers to the Image website. That is, Defendants were not content merely to redirect visitors who accidently typed "bandago.net" instead of "bandago.com" into their browsers. Instead, Defendants actively attempted to manipulate search engines to show the Image website as a result when consumers searched for "bandago" and related terms. It is hard to understand why Defendants would want to do that, unless they intended to use the Bandago mark to generate business for themselves. Indeed, Defendants offer no alternative explanation. Given these facts, the Court finds that there is only one reasonable interpretation of the evidence: Defendants acted in bad faith because they registered thebandago.net domain solely to take advantage of Digby's goodwill, reputation, and name recognition in the Bandago mark.

Because the Court finds that Defendants acted with the bad faith intent to profit from Digby's mark, all three elements of cybersquatting are satisfied. The Court finds that Van and Image are liable for cybersquatting. Digby's motion for summary judgment is GRANTED with respect to the allegations of cybersquatting by Van and Image.

### B. *The Individual Defendants*

Digby asserts that Mr. Zilberman and Mr. Sebag are both personally liable for the torts committed by the Corporate Defendants. Digby alleges that Mr. Zilberman and Mr. Sebag may be held liable directly and via an alter ego theory. De-

fendants concede that Mr. Zilberman may be personally liable for the Corporate Defendants' torts, but they contest Mr. Sebag's responsibility.[3] In fact, Mr. Sebag's personal liability is the subject of Defendants' own motion for summary judgment.

#### 1. *Schneior Zilberman*

█ "A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985) (internal quotation marks omitted). The parties agree that this principle extends to copyright and trademark infringement claims. *See* Digby Mot. at 20; Defs.' Opp'n at 12; *see also Foreverendeavor Music, Inc. v. S.M.B., Inc.*, 701 F.Supp. 791, 793–94 (W.D.Wash.1988) (president of corporation liable for corporation's infringement because he was "the dominant influence" in the corporation); *Polo Fashions, Inc. v. Branded Apparel Merch., Inc.*, 592 F.Supp. 648, 652 (D.Mass.1984) (officer individually liable because he was a "moving, active conscious force behind" the corporation's infringement").

█ Defendants acknowledge that Mr. Zilberman was responsible for the registration of thebandago.net domain name and that Mr. Zilberman was "solely responsible for Image's advertising and marketing," managed Image and Van's website and internet accounts, and ran Image and Van's day-to-day operations. *See* Defs.' Opp'n at 12–13; Zilberman Decl. ¶¶ 14,

---

3. Defendants apparently concede Mr. Zilberman's liability as an officer involved in the Corporate Defendants' torts, but they contest his liability as an alter ego. *Compare* Defs.' Opp'n at 12 ("Defendants concede that Zilberman personally participated in the events leading to the domain registration.") *and* 13

("Zilberman was solely responsible for Image's advertising and marketing, and solely responsible for Image's website"), *with* Defs.' Opp'n at 16 ("Defendants respectfully submit that disputed issues of fact exist as to whether Image or Van are Zilberman's alter egos.").

17–19. Mr. Zilberman admits that he "personally participated in the events leading to the domain registration." *Id.* at 12. Mr. Zilberman also says that he "was responsible for Image's day-to-day operations, its management, and supervising employees." Zilberman Decl. ¶ 15. Defendants do not explicitly concede Mr. Zilberman's liability (as they do for Van and Image), but these admissions are sufficient for the Court to find that Mr. Zilberman directed and participated in the torts committed by Image and Van. As a result, the Court finds that Mr. Zilberman is liable on the copyright infringement, trademark infringement, and cybersquatting causes of action described above. Digby's motion for summary judgment is GRANTED with respect to Mr. Zilberman's liability. Because the Court finds that Mr. Zilberman is directly liable for these torts, the Court need not reach the issue of Mr. Zilberman's alter ego liability.

### 2. *Gad Sebag*

Mr. Sebag's liability is contested. Digby claims that he is liable both as a direct participant in the various torts alleged and that Van and Image's liability can be imputed to him because the Corporate Defendants are Mr. Sebag's alter egos.

### i. *Direct Liability*

Digby argues that Mr. Sebag must have directed or participated in the Corporate Defendants' torts because he incorporated both Van and Image, was the sole shareholder of both companies, and was Van's only officer and employee. Reply at 3. Mr. Sebag's personal credit card was also used to register thebandago.net domain name, and Mr. Sebag was listed as the account holder for the Corporate Defendants' Google AdWords accounts. *Id.* Mr. Sebag counters that he was barely involved in either corporation. He recounts that Mr. Zilberman (his brother-in-

law) came to him for help, and he agreed to let Mr. Zilberman form and operate the corporations under his name and use his credit. Mr. Sebag says he did so to help a family member, and that Mr. Zilberman needed his help because Mr. Sebag had funds and better credit. Sebag Decl. I ¶¶ 6–7. Mr. Sebag recalls signing certain incorporation documents and loaning money to Image, but says that he "did not have any role" in "Image's management or operations." *Id.* ¶ 11. Mr. Zilberman's testimony corroborates this: he testifies that he, and not Mr. Zilberman, managed both Image and Van. Zilberman Decl. ¶¶ 14, 17–19. According to Mr. Zilberman, Mr. Sebag was only involved in the companies when his signature was required for something, which was "rare." *Id.* ¶ 16. Mr. Sebag never received a salary or any other type of compensation from Image. *Id.* ¶ 15.

■ Digby asserts that Mr. Sebag's declaration is a self-serving declaration that contradicts his earlier statements and documentary evidence. The Court disagrees. Mr. Sebag's declaration does not contradict any of the evidence Digby has presented. If it is true that Mr. Sebag entrusted Mr. Zilberman to use Mr. Sebag's name to found Image and Van, then it makes sense that Image and Van were incorporated under Mr. Sebag's name and used his name for their accounts. If Mr. Sebag had contradicted his prior deposition testimony, then the Court might have found his declaration to be a sham. *See Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."). Rejecting Mr. Sebag's declaration in this manner requires a factual finding that the contradiction actually was a sham. *Id.* at 267. The Court cannot make such a

finding here, and therefore cannot strike Mr. Sebag's declaration as a sham. It is, therefore, inappropriate for the Court to make credibility determinations or to draw from the evidence inferences adverse to Defendants. *See His & Her Corp. v. Shake–N–Go Fashion,* Inc., 572 Fed.Appx. 517, 518 (9th Cir.2014) ("In resolving summary judgment motions, a court must not weigh the evidence, make credibility determinations, or draw inferences from the facts adverse to the non-moving party.").

Because the Court cannot discount Mr. Sebag's declaration, the evidence provides for at least two reasonable interpretations of the facts. A trier of fact could select either depending on the credibility it assigns to Mr. Sebag and Mr. Zilberman's statements. If the trier of fact believed Mr. Sebag and Mr. Zilberman, then it could find that Mr. Sebag did not direct or participate in any of the Corporate Defendants' torts. In that scenario, Mr. Sebag would not be directly liable. On the other hand, a trier of fact could also reasonably discount Mr. Sebag and Mr. Zilberman's testimony and find that the documentary evidence indicates that Mr. Sebag had a much larger role in Image and Van than he admits. It would certainly be possible for the trier of fact to *infer* from the documentary evidence that Mr. Sebag was heavily involved in the management and operation of the Corporate Defendants. In that case, Mr. Sebag might be held liable for Image and Van's torts as a participant. However, the Court is required to draw inferences from the evidence in favor of the non-moving party. As a result, the Court cannot draw the inferences required to hold Mr. Sebag directly liable. However, nor can the Court weigh the evidence in such a way as to find that Mr. Sebag was *not* involved in the Corporate Defendants' torts. The Court finds that a genuine dispute of material fact exists as to whether Mr. Sebag was involved in the Corporate Defendants' torts. Both motions for summary judgment are DENIED as to Mr. Sebag's direct liability.

#### ii. *Alter Ego Liability*

"The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests ... In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation...." *Mesler v. Bragg Mgmt. Co.,* 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 702 P.2d 601 (1985) (internal citation omitted). The parties agree that California law governs the alter ego dispute in this case. *See* Mot. at 21 n.7; Opp'n at 14–15. There are "two general requirements" for a plaintiff to pierce the corporate veil: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Id.*

California courts have developed a long list of factors to consider when deciding whether it is proper to pierce the corporate veil. Those factors are:

the commingling of funds and other assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to seek authority to issue stock or issue stock under existing authorization; the representation by an individual that he is personally liable for corporate debts; the failure to maintain adequate corporate minutes or records; the intermin-

gling of the individual and corporate records; the ownership of all the stock by a single individual or family; the domination or control of the corporation by the stockholders; the use of a single address for the individual and the corporation; the inadequacy of the corporation's capitalization; the use of the corporation as a mere conduit for an individual's business; the concealment of the ownership of the corporation; the disregard of formalities and the failure to maintain arm's-length transactions with the corporation; and the attempts to segregate liabilities to the corporation.

*Mid–Century Ins. Co. v. Gardner,* 9 Cal. App.4th 1205, 1213 n. 3, 11 Cal.Rptr.2d 918 (1992). However, "[t]his long list of factors is not exhaustive. The enumerated factors may be considered [a]mong others under the particular circumstances of each case." *Zoran Corp. v. Chen,* 185 Cal. App.4th 799, 812, 110 Cal.Rptr.3d 597 (2010) (internal quotation marks omitted).

█ Some of the enumerated factors favor Digby, and some favor Defendants. For example, it is undisputed that Van and Image failed to maintain corporate minutes or records, that Mr. Sebag was Image's only shareholder, that Van and Image were inadequately capitalized (they declared bankruptcy shortly after this lawsuit was filed), and that Van and Image completely disregarded corporate formalities. Those factors, therefore, favor a finding that Van and Image were Mr. Sebag's alter egos. On the other hand, there is conflicting evidence regarding *control* of the corporations by their stockholders: Digby asserts that Mr. Sebag ran both corporations, while Mr. Sebag says he was only nominally involved. Additionally, while there is some evidence that Van may have been a shell corporation to shield Image, there is not much evidence that

Defendants tried to conceal Mr. Sebag's involvement in either corporation.

When considering the facts of this case, the outcome is again heavily dependent on the credibility of Mr. Sebag's and Mr. Zilberman's statements and the inferences drawn from the documentary evidence. If the trier of fact were to find Mr. Sebag and Mr. Zilberman unreliable, it might infer from the documentary evidence that Mr. Sebag was deeply involved in controlling the Corporate Defendants. Such a finding might support a decision that Van and Image truly were Mr. Sebag's alter egos. However, if the trier of fact were to find Mr. Sebag and Mr. Zilberman to be credible, then it would be reasonable to find that there was little unity of interest and ownership between Mr. Sebag and the Corporate Defendants or that it would be equitable to find piercing the corporate veil unnecessary.

Digby points out that corporate officers are generally not excused from their responsibilities merely because they consider themselves to be figureheads. *See* Digby Opp'n at 18–19. That is true, but the cases Digby cites are all in the context of establishing the officer's duties to his company. While Mr. Sebag may have done the Corporate Defendants and their shareholders (in this case, only Mr. Sebag himself) a disservice by failing to fulfill his role as CEO, that failure does not require the Court to overlook his general lack of involvement when determining alter ego liability. Mr. Sebag's neglect of his official duties does not automatically make him an alter ego of Image simply by virtue of the fact that he was the CEO and sole shareholder.

Deciding the issue of Mr. Sebag's liability as an alter ego of Image or Van requires drawing inferences from the evidence and weighing the credibility of evidence and witnesses. At this stage, all

inferences must be drawn in favor of the non-moving party, and it is inappropriate to determine credibility. Because there are at least two reasonable explanations of the evidence, each of which requires drawing inferences in favor of the moving party or making a credibility determination, it is inappropriate to grant summary judgment for either party on this issue. Both motions for summary judgment are DENIED as to Mr. Sebag's liability as an alter ego for the Corporate Defendants.

## C. *Damages*

Digby seeks statutory damages for its cybersquatting claim and disgorgement of profits for its trademark and copyright infringement claims. *See* Digby Mot. at 24.

### 1. *Statutory Damages for Cybersquatting*

■ A party that prevails on a claim of cybersquatting may elect to recover "instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). Digby requests the maximum statutory damages of $100,000. Digby Mot. at 24. In determining appropriate statutory damages for cybersquatting,

> courts generally consider a number of factors ... including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its in-

fringing activities, the defendant's status as a "serial" cybersquatter—i.e., one who has engaged in a pattern of registering and using a multitude of domain names that infringe the rights of other parties—and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings.

*Verizon Cal. Inc. v. Onlinenic, Inc.,* C 08–2832 JF (RS), 2009 WL 2706393 (N.D.Cal. Aug. 25, 2009). Courts in similar cases have awarded a range of damages.[4]

■ In this case, the Court has found that Defendants' cybersquatting was willful and, if not egregious, certainly more pernicious than simply registering a suspiciously similar domain name. However, the evidence of false contact information and Defendants' status as "serial cybersquatters" is decidedly mixed. There is no evidence of an attitude of contempt toward the court or proceedings. In a recent cybersquatting case, the undersigned awarded $50,000 in statutory damages where there was powerful evidence of the defendant's bad faith and status as a serial cybersquatter, and where the defendant had shown contempt for the Court by refusing to appear or respond to summonses. *See Ploom, Inc. v. iPloom, LLC,* No. 13–CV–05813 SC, 2014 WL 1942218, at *7–8 (N.D.Cal. May 12, 2014). Here, the Court finds that an award of $25,000 appropriately captures the egregiousness of Defendants' violation of the law.

---

**4.** *See, e.g., Partners for Health & Home, L.P. v. Yang,* 488 B.R. 109 (C.D.Cal.2012) (awarding $25,000 for domain through which defendant had sold products willfully infringing on plaintiff's trademarks); *Wecosign, Inc. v. IFG Holdings, Inc.,* 845 F.Supp.2d 1072, 1085–87 (C.D.Cal.2012) (awarding $50,000 where defendant had provided false contact information to the domain registrar but no other factors were present); *Verizon Cal. Inc. v. Onlinenic, Inc.,* C 08–2832 JF (RS), 2009 WL 2706393 (N.D.Cal. Aug. 25, 2009) (awarding $50,000 per violation where all four factors were present); *Citigroup, Inc. v. Shui,* 611 F.Supp.2d 507, 513 (E.D.Va.2009) (awarding $100,000 where defendant's use of the domain was "sufficiently willful, deliberate, and performed in bad faith").

## 2. Actual Damages for Trademark and Copyright Infringement

■ Both the Lanham Act and the Copyright Act permit a prevailing plaintiff to recover the defendant's profits. *See* 15 U.S.C. § 1117(a); 17 U.S.C. § 504(b).[5] In the copyright context, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504. In the trademark context, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C § 1117(a). The Lanham Act also provides some additional guidance for assessing damages in trademark cases:

> In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of

the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

*Id.*

■ "Trademark remedies are guided by tort law principles.... As a general rule, damages which result from a tort must be established with reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993) (internal citations and quotations omitted). Damages "will not be awarded in the absence of credible evidence demonstrating injury to plaintiff resulting from defendant's sales. Damage awards for lost sales and profits may not be based upon the assumption that a trademark infringement resulted in commercial injury." *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.Supp. 619, 624 (S.D.N.Y.1981) (*cited in Lindy*, 982 F.2d at 1408). Thus Digby must show some evidence of injury as a

**5.** Defendants argue briefly that that Digby must elect between statutory and actual damages because Digby's claims are based on the same underlying conduct. In support they cite a single unreported case from this District, in which the court declined to award both statutory and actual damages. However, the court emphasized that the decision was discretionary. *See Media Lab, Inc. v. Collis*, No. C08–04732 HRL, 2010 WL 3893582, at *6 (N.D.Cal. Sept. 30, 2010). Digby responds by pointing to a number of out-of-district cases in which courts held that the ACPA permits an award of both statutory and actual damages. *See St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1204 (11th Cir.2009) ("Congress, by statute, has prescribed recovery under the ACPA even if it is duplicative of other damages awarded."); *Wecosign, Inc. v. IFG Holdings*, Inc., 845 F.Supp.2d 1072, 1085 (C.D.Cal.2012) ("A prevailing plaintiff may recover statutory damages under this provision in addition to actual damages for infringement of its trademark."). The Court agrees

and holds that a plaintiff recover both statutory damages for cybersquatting and actual damages for trademark or copyright infringement. However, it is also true that Defendants' copyright violation (the use of text from Digby's website on the Image website) arose from different conduct than the trademark and cybersquatting claims (registration of thebandago.net domain). Digby argues that the trademark claim also arose from different conduct than the cybersquatting claim, because the trademark claim is based on Defendants' Google AdWords bids, while the cybersquatting claim is based on registration of thebandago.net domain. Whether bidding on AdWords alone is sufficient to establish a trademark violation is a question that the parties have not briefed and that is not before the Court. To resolve the current case, it is sufficient to hold that Digby may recover both statutory damages for cybersquatting and actual damages for the same conduct, and that Defendants' copyright infringement arose from different underlying conduct than Defendants' cybersquatting.

result of Defendants' conduct before it can recover Defendants' ill-gotten profits.

■ Digby asserts that Defendants reaped $3,583,264.00 in revenues between January 2009 and May 2010. *See* Rosenfeld Decl. Exs. 28–29; Mot at 25. Apparently, that figure was reached simply by adding up every deposit to Defendants' various bank accounts during that period. *See* Rosenfeld Decl. Ex. 29. Defendants argue that Digby's figures vastly overstate the Corporate Defendants' profits—in fact, they assert that Van and Image operated at a loss. Defs.' Opp'n at 22–25.

It is true that Digby's damages calculations are based on a number of astonishingly unreasonable assumptions. First, Digby assumes that it suffered some commercial injury sufficient to support an award of actual damages. Next, Digby assumes that every deposit in the Corporate Defendants' accounts was a sale or revenue. That is not necessarily the case; for example there is evidence that Mr. Sebag loaned Image over $200,000. *See* Digby Mot. at 7. Third, Digby assumes that *all* of the Corporate Defendants' revenues were attributable to their infringement.[6] However, while Digby's claimed damages are simply ludicrous in light of the evidence, Defendants are also culpable for the difficulty involved in calculating damages in this case: Image claims it has no profit and loss statements or balance sheets, and Mr. Zilberman indicated that he "might have disposed of" Image's books and records. *See* ECF No. 137 Exs. 13 at 11–12; 43 at 65:2–66:8.

■ To succeed on its claim for disgorgement of profits, Digby must provide a reasonably reliable estimate of Defen-

dants' profits from their van rentals. The sum of all deposits to Defendants' bank accounts is insufficient. "The court cannot award profits without any evidentiary basis on which to rest such an award." *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 597 F.Supp. 1186, 1190 (E.D.N.Y. 1984) *aff'd*, 765 F.2d 966 (2d Cir.1985). Digby has failed to establish Defendants' revenues to a reasonable certainty.

Nor is it clear that Digby suffered any actual loss at all from Defendants' trademark or copyright infringement. Apparently, Defendants bid on 14,057 keywords with their AdWords accounts. *See* Rosenfeld Decl. ¶ 22. The evidence shows that 14 (or 0.1%) included the word "bandago." *See id.* Ex. 23. Of those 14 AdWords, only three generated any clicks at all. Each of those three keywords generated exactly one click. *See* id. Ex. 23. In other words, Defendants' bids on infringing keywords from November 2008 to April 2009 resulted in a total of three visits to Defendants' website. Even assuming all three visits were from different users, that each would have rented from Bandago absent the advertisements, *and* that each of those users proceeded to rent vans from Defendants instead, Digby's actual damages attributable to the infringing AdWords must have been vanishingly small.

With respect to Defendants' copyright infringement, Defendants copied only a few paragraphs of text from the Bandago website. That text was fairly generic, and tended to describe a specialization in large vans for extended trips. *See* Rosenfeld Decl. Exs. 52–53. The copied text invariably appeared at the very bottom of a long page of non-infringing text describing Image's passenger van rental options. *Id.*

---

6. The law does permit Digby to make this assumption and places the burden of showing the portion of profits not attributable to infringing activity on the defendant. However, the Lanham Act makes clear that principles of equity must guide the Court in determining damages. The unreasonableness of this assumption is described in greater detail below.

Neither Digby nor Defendants sold the copyrighted material, so the only cognizable lost profits attributable to copyright infringement are the proceeds from those customers induced by the infringement to rent vans from Defendants instead of Bandago. There is no evidence whatsoever indicating that a single customer was swayed by the infringing text.[7]

Digby's motion for summary judgment is therefore DENIED with respect to its claim for disgorgement of profits.

## V. CONCLUSION

For the reasons set forth above, Plaintiff Digby Adler Group, LLC's motion for summary judgment is GRANTED in part and DENIED in part. The motion is granted as to Digby's claims for copyright infringement, trademark infringement, and cybersquatting against Defendants Image Rent A Car, Inc., Van Rental Co., Inc., and Schneior Zilberman. Digby's motion is DENIED with respect to Defendant Gad Sebag's liability. Mr. Sebag's motion for summary judgment is also DENIED. The Court finds that Digby is entitled to $25,000 in statutory damages, but that Digby's evidence is insufficient to support summary judgment for disgorgement of profits. Thus two issues remain in this case: (1) Mr. Sebag's liability, both directly and as an alter ego, for the Corporate Defendants' torts; and (2) the amount of actual damages to which Digby is entitled (if any). The Court will refrain from entering judgment in this matter until those remaining issues are fully adjudicated.

IT IS SO ORDERED.

---

7. Digby mentions actual confusion only once in its moving papers. It asserts, with no evidentiary basis, that it "received several inquiries about the relationship between Plaintiff and Defendants." Digby Mot. at 17.