Filed 7/18/22 Quince & Co. v. The Barrel Cellar CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| QUINCE & CO., LLC, et al., <br>      Cross-defendants and Respondents, <br> v. <br> THE BARREL CELLAR, LLC, et al., <br>      Cross-complainants and Appellants. | A160014 <br><br> (San Francisco County <br>  Ct. No. CGC-17-561363) |

      This case involves the interpretation of a "Non-Circumvention, Non-Disclosure, and Confidentiality Agreement" (NCA) which two restauranteurs and their companies entered at a time they were contemplating one company taking over the other's leased commercial space. The Barrel Cellar, LLC (Barrel Cellar) and its sole owner and member, Jim Howell, contend the trial court erred in finding Barrel Cellar's cross-complaint time-barred under the NCA and in adding Howell as a judgment debtor on an alter ego theory. We affirm.

**BACKGROUND**

*Barrel Cellar's Lease*

      Barrel Cellar operated a wine bar called Barrique on premises located at 461 Pacific Avenue in San Francisco, which it leased from Noel Margaret Lawrence. Howell signed the lease as president of Barrel Cellar and in his

1

individual capacity as guarantor of the lease.  The lease, which ran from September 15, 2009, to April 14, 2015, provided for monthly rent of $3,280 beginning in April 2010, with specified annual increases.

The lease gave Barrel Cellar a right to renew for an additional five-year term if it gave written notice of its "desire to exercise the option to renew" between October 15, 2014, and December 15, 2014.  Rent for the first year of an extended term would be "95% of the then Fair Market Value of the Premises," as agreed by the parties or determined by arbitration, with specified annual increases for subsequent years.

In June 2013, Howell and Lawrence began to discuss "firming up the extension of the lease."  Howell told Lawrence, "I have not been able to take a penny out of the business since inception and still have investments I would like to make to the space that would increase the long-term value so I am hoping that we can be in the same ball park as we are now."  As of January 2014, Howell was paying rent of $3,584 per month.[1]

Between January and April 2014, Howell and Lawrence discussed the market rate for leased commercial space in Jackson Square.  Lawrence initially assured Howell that "[a]ssuming Barrique desires remaining in tenancy, I feel that once we find data we agree is reliable, we should have no real problem coming to terms."  However, on April 26, 2014, Lawrence told Howell that "[i]f the rent [the property] commands as a bar/restaurant use is near what Barrique is paying now, I need to convert the space to open floor plan office use," which would "command[] a significantly higher rate of rent."  Howell responded:  "Obviously that is disappointing and I'll look at your

---

[1] The lease provided that the rent would increase annually by 3 percent or the Bay Area Consumer Price Index (CPI) increase, whichever was greater.

market data; what kind of increase are you looking for?" Lawrence sent Howell a lease calling for a five-year term at $5,253 per month for the first year, with specified annual increases.

### The NCA

Lindsay Tusk (Tusk) and her husband Michael Tusk are the managing members of Quince & Co., LLC (Quince). Quince operated two restaurants, Quince and Cotogna, which were located across the street from Barrique at 470-490 Pacific Ave. In 2012, Tusk raised the possibility of Quince taking over Barrique's space if Barrel Cellar relocated or declined to renew the lease. In February 2014, Howell and Tusk began discussing a transaction in which Barrel Cellar would sell its assets and inventory to Quince, which would then rent the space from Lawrence. In May, Howell told Tusk he was "wrapping up negotiations on the extension" of his lease and asked if she was still interested in "pursuing the space." Howell provided Tusk with information about the current lease and potential extension, the premises, and his business. On June 19, 2014, Tusk e-mailed Howell an offer to purchase Barrel Cellar's assets and inventory for $175,000 provided Quince was able to obtain specified changes in the lease terms."[2]

Howell e-mailed Tusk a signed copy of the NCA on June 23, 2014, saying, "[g]iven we'll be going to the landlord in a 3 party negotiation I would like to get the attached NDA executed." Tusk signed the NCA on June 24, 2014 and returned it to Howell the next day.

---

[2] The offer specified "100,000 upon close of escrow," "75,000 carried for 12 months at 3%" and "Successful transfer of beer and wine license." Tusk wanted a 10-year lease with an option to renew for 5 years at 95 percent of fair market value, along with the modification of various provisions of the existing lease.

3

The NCA stated that the parties were contemplating "entering into, or participating in a business transaction[] including the purchase or lease of the business located at 461 Pacific Avenue, San Francisco, California" and wished to "legally bind each other from" disclosing defined confidential information learned from each other "in the transaction of the subject business," and that the "Seller" (defined as "THE Barrel Cellar LLC dba 'Barrique' and Jim Howell") "wishe[d] to be protected from circumvention by Buyer and Landlord/Property Owner." Paragraph 2 of the NCA stated that "neither party . . . will attempt, directly or indirectly, to contact the other parties' landlord, vendors consultants on matters relating to the subject business or contact or negotiate with the confidential source or make any use of the confidential information of the other party, except through such other party or with the express written consent of such other party as to each such contact and/or use."

On July 2, 2014, Howell sent Tusk a counter-offer, suggesting that Quince buy Barrel Cellar's assets for $300,000.[3] Tusk rejected Howell's counter-offer, stating, "I think we are going to look at other opportunities as . . . we are too far apart on the numbers as counter-proposed." Two months later, Howell e-mailed Tusk suggesting further negotiation before he executed his lease extension. Tusk increased Quince's offer to $200,000[4] and "propose[d] the original approach with the landlord—the three of us meeting and having her be a part of the process." Howell responded that the purchase price was acceptable depending on what inventory and furniture was

---

[3] Howell proposed a payment of $225,000 upon close of escrow and 5 percent interest on the $75,000 to be carried for 12 months.

[4] Tusk's offer specified $125,000 upon close of escrow, $75,000 carried for 12 months at 5 percent interest and successful transfer of the beer and wine license.

4

included.  He added that Lawrence had told him she was "open to the idea of taking on a new tenant."  Tusk visited the leased premises and asked Howell about "as builts—electrical, mechanical and plumbing" and available power and Howell provided several "designs."

On November 24, 2014, Howell introduced Lawrence to Tusk by e-mail. Howell said he thought Tusk could be a "great tenant," and the question was whether there were "common terms that each party could agree to get the deal done."  Howell stated, "We'd like to see if there's an opportunity to work this out from Barrique's perspective, but we're happy to stay the course too if the discussion doesn't work out."  He also told Lawrence, "[Tusk] has executed a Confidentiality and Non-Circumvention Agreement so please feel free to speak openly to see if there's any interest from your side. . . ."

Lawrence and Tusk spoke on December 2, 2014.  When Howell asked Tusk on December 11 for feedback, she told him she had spoken with Lawrence and would "circle back" with him "shortly."  The next he heard from Tusk, however, was on March 2, 2015, when Tusk "feigned" that Lawrence was being difficult to negotiate with.  Tusk told Howell that Quince was no longer willing to pay $200,000 for Barrel Cellar's inventory:  "With the lease terms that [Lawrence] is proposing, and our build out costs (See attached estimate) we are prepared to offer you 50K."  Howell asked Tusk what terms she would need from Lawrence "to honor the original offer" of $200,000, saying he would "see if there's common ground."

The next day, March 3, 2015, Lawrence told Howell she was "already way down the road with Tusk in Quince's lease negotiation."[5]  This was "a shock to [Howell]," as Tusk "never obtained [his] express written permission

_____

[5] In a March 2, 2015 e-mail, Lawrence told Tusk that Howell's tenancy was terminating in April.

to negotiate with or even contact Lawrence, as required by the NCA, beyond the initial contact to inquire whether there was mutual interest in working out a three-way deal." Howell told Lawrence he was "stunned" because they had been negotiating Barrel Cellar's lease renewal and "Tusk was prohibited by the NCA from circumventing Barrel Cellar." He "reminded Lawrence that Barrel Cellar had exercised the renewal option," said he "wanted to enforce Barrel Cellar's rights under the Lease," and "told Lawrence that Barrel Cellar would pay whatever she wanted for rent, including the $40/sq ft that Lawrence previously requested."

On March 4, 2015, Lawrence left Howell a message saying she would not agree to Barrel Cellar remaining at the property. On March 7, Lawrence said she would consider allowing Barrel Cellar to remain "for a short while" on a month-to-month basis. Lawrence also warned Howell, "I hope you will not hold over after the term of your tenancy without my consent. By the terms of the lease, such a holdover would make you a tenant at sufferance at double your current rent."

On March 9, 2015, Howell e-mailed Lawrence, "I wanted to reaffirm my interest in staying at 461 Pacific. I signed the lease that you sent previously in the attached in the hopes of you reconsidering. [¶] Have you already signed a lease with [Tusk]?" Lawrence forwarded this e-mail to Tusk and Tusk sent Lawrence a copy of the NCA.

On March 10, Lawrence sent Tusk a proposed lease for a five-year term beginning April 15, 2015. Tusk arranged a phone call between herself, her attorney, and Lawrence for March 13. Lawrence e-mailed Howell on March 11, saying she had not yet signed a lease with Tusk, but wanted to; she "thought you wanted me to as well as you put the two of us together for that purpose." Lawrence forwarded this e-mail to Tusk.

6

On March 13, Tusk and her attorney told Lawrence during a phone call "[t]hat the Tusks were not going to represent, promise, commit, or do anything of any sort whatsoever until and unless all discussions were ended between Ms. Lawrence and the [Barrel Cellar] and there was no question that [the premises] was available open space for tenancy/rent."  Lawrence e-mailed Howell the same day, saying she had not signed a lease with Tusk or decided whether to continue to lease the space for restaurant/bar use or convert it to office space, but had decided not to renew with Barrel Cellar.[6] Lawrence then left a message for Tusk saying she had e-mailed Howell "along the lines that had been discussed in the phone call and also raised possibility of converting space to offices in other words to introduce that possibility that [Tusk] would not be the only person interested in the space."

Howell responded to Lawrence's e-mail on March 20, saying he did not agree with her reasoning, but would close Barrique and move out because he could not keep his employees in limbo.  According to Howell, Barrel Cellar moved out on April 14, 2015, "because Lawrence threatened to charge it double rent as a holdover tenant if it stayed, it did not have the funds to pursue litigation, and I could not keep Barrique's employees and vendors . . .

---

[6] Lawrence stated, "I have not signed a lease with Lindsay, nor have I signed a lease with anyone else.  [¶] And I have not made a final decision as to whether the space will remain a restaurant/bar use, or whether I will convert it to open floor plan office space.  [¶] Such a conversion would not cost much, and office use commands a price more than 25% above the $40 a foot price of the lease I sent you.  [¶] What I have decided, however, is that I do not plan to renew with Barrique, for the reasons we discussed.  [¶] Chiefly, because it appears that Barrique is not strong enough financially.  [¶] You said that you only broke even when paying only $28 a foot. [¶] And though you pointed to the fact that December had been profitable, that's not enough to support a decision that a renewal of five years at $40 is a lease either of us should be entering into."

in limbo as to Barrique's future.  [¶] As a result of Tusk and Quince's actions, Barrique was forced to shut down and I lost my investment in Barrel Cellar."

On April 30, 2015, Quince entered a lease with Lawrence to occupy the premises at 461 Pacific Avenue for a five-year term beginning May 1, 2015, at a rate of $40 per square foot.  Disagreements later arose between Lawrence and Tusk regarding remodeling and use of the leased premises; Quince vacated the premises in February 2016.

### The Present Case

This case began with a complaint filed by Lawrence on September 18, 2017, against Howell and Barrel Cellar for breach of contract, waste, and conversion based on alleged damage to the leased premises and removal of permanent fixtures.

On November 7, 2017, Howell and Barrel Cellar answered the complaint and Barrel Cellar filed a cross-complaint against Lawrence, Tusk and Quince.  The cross-complaint alleged causes of action against Lawrence for breach of contract (lease) and breach of the covenant of good faith and fair dealing; against Tusk and Quince for breach of contract (NCA) and breach of the covenant of good faith and fair dealing; and against all for intentional interference with contractual/business relations, tortious interference with economic/business advantage and unjust enrichment.  The cause of action for breach of contract against Tusk and Quince alleged that they materially breached the NCA by contacting and negotiating the terms of a lease with Lawrence directly and without Barrel Cellar's knowledge or involvement, sharing Barrel Cellar's confidential information with Lawrence and entering into a lease for the property without Barrel Cellar's consent, knowledge, or involvement.

8

In October 2018, Howell and Barrel Cellar settled their dispute with Lawrence, who is not involved in this appeal.

At the outset of trial on Barrel Cellar's cross-complaint, the trial court bifurcated certain legal issues, including interpretation of the NCA, to be decided before the case was presented to a jury. Of primary relevance to this appeal was the interpretation of paragraph 5 of the NCA. Tusk and Quince maintained that paragraph 5 required claims arising out of the NCA to be filed within three years of the date the agreement was signed, while Barrel Cellar argued that paragraph 5 stated the time period the NCA would remain in effect and binding on the parties.

After several rounds of briefing and hearings, the trial court filed its amended order on the bifurcated issues on March 11, 2019. The court found Barrel Cellar's cause of action for breach of contract time barred because the NCA required any claims as to the meaning or enforceability of the agreement to be filed on or before June 24, 2017. In the alternative, the court found that interpreting the NCA as imposing binding obligations for a period of three years would be unreasonable, and that Tusk's obligations under the NCA, as they related to conduct with Lawrence, ended on April 15, 2015, when Barrel Cellar's lease ended and it vacated the leased premises. Barrel Cellar subsequently dismissed its tort claims (fifth, sixth, and seventh causes of action) without prejudice. The trial court entered judgment in favor of Tusk and Quince on the first and fourth causes of action (breach of contract and breach of the covenant of good faith and fair dealing) on May 17, 2019.

On July 8, 2019, Tusk and Quince filed a motion to amend the judgment to add Howell as a judgment debtor on the theory that he used Barrel Cellar as an alter ego for this litigation. After a hearing, the court issued a tentative decision in favor of Tusk and Quince; Howell submitted

objections; and on December 5, 2019, the court filed its statement of decision in favor of Tusk and Quince.[7]

On December 16, 2019, the trial court filed an amended judgment adding Howell as a judgment debtor.

This appeal followed.

## DISCUSSION

### I.

" ' " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' (*Bank of the West v. Superior Court* [(1992)] 2 Cal.4th [1254,] 1264.) 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' (*AIU* [*Ins. Co. v. Superior Court* (1990)] 51 Cal.3d [807,] 822.) 'If contractual language is clear and explicit, it governs.' (*Bank of the West . . .* at p. 1264.)" (*Foster-Gardner* [*v. National Union Fire Ins. Co.* (1998)] 18 Cal.4th [857,] 868.)' " (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415, quoting *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

" 'A contract is ambiguous when, on its face, it is capable of two different reasonable interpretations.' " (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 848, quoting *United Teachers of Oakland v. Oakland Unified Sch. Dist.* (1977) 75 Cal.App.3d 322, 330.) " '[I]f there is ambiguity . . . it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.) If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. (*Id.*, § 1654.)' " (*Montrose*

---

[7] The court awarded Tusk and Quince $334,878.63 in attorney fees under the NCA.

10

*Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 667, quoting *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at p. 822; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 801 ["if the uncertainty is not removed by application of the other rules of interpretation, a contract must be interpreted most strongly against the party who prepared it"]; *Federal National Mortgage Assn. v. Bugna* (1997) 57 Cal.App.4th 529, 535 [ambiguities construed against drafter]; *Hellman v. Great American Ins. Co.* (1977) 66 Cal.App.3d 298, 303 [interpret contractual language "most strongly *against the party who caused the uncertainty to exist*"].)

Contract interpretation is a question of law where, as here, the interpretation is based on the terms of the agreement without use of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal." (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.) "The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted." (*Ibid.*)

### *The Trial Court's Interpretation of Paragraph 5*

Paragraph 5 of the NCA states: "In the event of any dispute as to the meaning or the enforceability of this agreement, all parties agree that California law shall apply and shall be binding upon the parties, their heirs, agents and assigns, for a period of three (3) years from the date of the last signature affixed hereon."

The trial court rejected Barrel Cellar's[8] interpretation of this provision as a fixed duration for the NCA. The court noted that paragraph 2 of the

---

[8] Barrel Cellar is the sole cross-complainant. However, the trial court and the parties refer to arguments advanced by Barrel Cellar as having been made by Howell or Barrel Cellar, so we follow this convention. Similarly,

11

NCA expressly prevented Tusk from contacting or negotiating with Lawrence except through Howell or with his express written permission. Because the NCA did not contain any exception for circumstances in which Lawrence and Howell did not have an existing relationship, the court reasoned that Howell's interpretation would mean Tusk was barred from contracting Lawrence for three years even if Howell closed his business or abandoned the lease the moment after the NCA was signed, which the court found "absurd, onerous and unreasonable." Additionally, Howell's interpretation would have the "harsh, unjust and inequitable consequence" of exposing Tusk to indefinite liability: If Tusk contacted Lawrence the day before the agreement expired, the four-year statute of limitations for breach of contract would allow Howell to assert a claim until June 24, 2021, or potentially much later if he did not immediately learn of the contract and the statute of limitations was tolled under the discovery rule.

By contrast, the court found Tusk's interpretation of paragraph 5 as limiting the time in which an action could be brought to be reasonable and consistent with the parties' expressed intent. The court noted that the NCA addressed a "one-time finite transaction where Tusk was considering the purchase of Barrel's interest in the lease of 461 Pacific, and its assets and inventory," which would have to occur at the latest by April 15, 2015, the date Barrel Cellar's original lease term ended. The court found it reasonable to interpret paragraph 5 as a time bar because it gave Howell a "fair opportunity" to bring his claim, and found this interpretation "particularly compelling" because Howell admitted he knew of the negotiations between Tusk and Lawrence in March 2015 and knew they had signed a lease in April

references to arguments made by Tusk means arguments made on behalf of Tusk and Quince.

12

2017, several months before expiration of the three-year period specified in paragraph 5. The court held that Howell's duty to determine whether there were facts warranting an action against Tusk for breach of the NCA arose on April 15, 2015, when Barrel Cellar vacated the premises, and that Howell's decision not to "conduct any inquiry to protect his right under the [NCA] is not an exercise of any diligence, let alone due diligence." Finally, the court held that to the extent any uncertainty remained, the NCA had to be construed against the drafter, Howell.

### *Paragraph 5 Limits the Time for Bringing an Action Under the NCA*

Howell contends paragraph 5 cannot reasonably be interpreted as a limitations period because it contains no language supporting that interpretation, such as "claims must be brought" within a specified time period or "may not be brought" after a certain period. Further, he argues the phrase "California law shall apply and shall be binding" for three years cannot be read to limit the time to file a claim because expiration of a limitations period only eliminates a remedy and does not render the law inapplicable or non-binding. In Howell's view, the only reasonable interpretation of paragraph 5, considering its language and purpose, is that it states the duration of the agreement.

We cannot agree. Interpreting paragraph 5 as a durational term is not "semantically reasonable," as Howell urges. Howell's interpretation requires both adding to and subtracting from the actual language of the provision.

Nothing in paragraph 5 expressly states the agreement shall be binding upon the parties for a period of three years. What it says is that "*California law shall apply and be binding* upon the parties, their heirs, agents and assigns, for a period of three years from the date of the last signature affixed hereon." (Italics added.) Read literally, this provision

13

would be absurd:  Parties to a contract cannot declare themselves outside the reach of the law.  Recognizing this, Howell argues the parties must have understood the provision to mean that "California law as embodied by the legal instrument they signed would bind them for three years" and, after three years, California law would no longer bind them "with respect to the agreement."  This is not what the provision says, and is a very convoluted way of saying what Howell believes it says.  Howell's interpretation would require the addition of a comma after the phrase "California law shall apply,"[9] as well as the words "this agreement shall" before "binding":  "California law shall apply*, and *this agreement shall* be binding . . . ."  "In construing a contract, the court's function is to ascertain and declare what, in terms and substance, is contained in that contract, and not to insert what has been omitted."  (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486.)  The court "cannot insert in the contract language which one of the parties now wishes were there."  (*Ibid.*; Code Civ. Proc., § 1858.)

Moreover, Howell's interpretation renders meaningless the introductory words of paragraph 5, "[i]n the event of any dispute as to the meaning or the enforceability of this agreement . . . ."  A contractual term stating the duration of the contract would apply regardless of whether a dispute arose between the parties, not solely "in the event of any dispute."

Howell's attempt to explain this language is not persuasive.  He asserts that "[a]lthough it does not specifically mention declaratory relief, paragraph 5's focus on disputes concerning the meaning or enforceability of the NCA helps explain why paragraph 5 goes on to identify the three-year term of

---

[9] Howell's attorney acknowledged this much in the trial court, telling the court, "it's almost as if there is a comma missing after the word 'apply.' "

duration." (See Civ. Code, § 1060 [action for declaration of "rights and duties" under a written instrument or contract "including a determination of any question of construction or validity arising under the instrument or contract"].) From this premise, he argues the effect of paragraph 5 is to put the parties on notice that they are "stuck" with the agreement for three years from execution, and if a party were to seek declaratory relief, the resulting judgment "would govern the parties' rights and duties for three years." But the "in the event of any dispute" language is unnecessary for these purposes. A simple statement of duration would obviously put the parties on notice of that duration, and any judicial declaration of rights and duties under the NCA necessarily would be limited to the time period stated in the agreement.

Including the introductory language of paragraph 5 in a provision intended to specify how long the parties intended to be bound by the agreement would be both illogical and misleading, as the durational term has nothing to do with the existence of a dispute. By contrast, "[i]n the event of any dispute as to the meaning or the enforceability of this agreement" is a logical start to a provision stating the time within which claims under the NCA must be brought.

Howell's argument that his interpretation of paragraph 5 better effectuates the parties' intentions does not overcome the interpretation supported by the language of the provision. Emphasizing that the NCA protects against disclosure of the parties' confidential information, as well as against communications between Tusk and Lawrence without Howell's consent,[10] Howell argues that the main point of a nondisclosure provision for

---

[10] Paragraph 2 of the NCA states that "neither party . . . will attempt, directly or indirectly, to contact the other parties' landlord, vendors consultants on matters relating to the subject business or contact or negotiate

15

parties exploring a potential transaction is to protect confidential information in the event the transaction falls through and the parties' interests cease to be aligned. This is "nearly always" done, he maintains, by specifying a period of several years during which the parties agree not to use or disclose each other's confidential information, and a three-year durational term is reasonable for this purpose. According to Howell, to suggest that the terms of the NCA no longer apply once the parties cease discussion of the proposed transaction contravenes the parties' intentions by failing to ensure nondisclosure for any period after their business relationship ends.[11]

The trial court did not analyze the nondisclosure aspect of the NCA and Tusk and Quince do not address it in their brief—presumably because the alleged breach of the NCA pertained primarily to the non-circumvention provisions.[12] However, the record shows that Howell provided Tusk with

with the confidential source or make any use of the confidential information of the other party, except through such other party or with the express written consent of such other party as to each such contact and/or use."

[11] Howell argues the trial court's implied durational term would allow Tusk to use Howell's confidential information and cut him out of the deal— exactly what the NCA prohibited—by unilaterally ending discussions with him (thus terminating the NCA) immediately after obtaining Howell's confidential information and an introduction to Lawrence. This, he urges, is the opposite of what a nondisclosure provision should do: Instead of protecting the parties' confidential information for some time after the contemplated transaction fell apart and thus providing protection after the parties' interests ceased to be aligned, the court's implied term would allow the parties to disclose each other's confidential information the moment their business relationship ended.

[12] Although the cross-complaint included "[u]pon information and belief, sharing [Barrel Cellar's] confidential information with Lawrence" as one of the alleged breaches, its main emphasis was on Tusk contacting, negotiating with and entering a lease with Lawrence without Howell's consent, and this was the focus of arguments at trial.

considerable information about the terms of his lease, the potential extension, the premises and his business before asking her to sign the NCA. The parties' negotiations focused on Barrel Cellar vacating the premises rather than extending the lease, with Quince compensating Barrel Cellar for giving up the lease extension by paying $200,000 for its inventory and assets. Since the original lease ended on April 15, 2015, it is reasonable to infer the parties must have intended to complete the transaction by that time, less than a year after the NCA was signed. Under these circumstances, Howell's insistence that the parties intended the nondisclosure period to extend two years beyond the expected completion of the deal does not provide a reasonable basis for interpreting paragraph 5 in a manner that its terms do not support.[13] Conversely, it *is* reasonable that parties to a time-limited transaction would require a claimed violation of the NCA be asserted within a specified time frame—the interpretation that is better supported by the language of paragraph 5.[14]

---

[13] In any event, Howell's complaint about the trial court's implied durational term is not directly relevant to interpreting the language of paragraph 5. Even if we were to agree that the implied term was unreasonable, it would not follow that paragraph 5 should be interpreted as a durational provision despite the semantic problems with that interpretation.

[14] No question is raised on appeal as to the enforceability of a provision which limits the time in which to file a claim, although there was some discussion of this point in the trial court. "California courts have overwhelmingly granted contracting parties substantial freedom to shorten an otherwise applicable statute of limitations, so long as the time allowed is reasonable." (*Brisbane Lodging, L.P. v. Webcor Builders, Inc.* (2013) 216 Cal.App.4th 1249, 1262; *Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1430.) Here, as events played out, Howell knew by March 2015 that Tusk and Lawrence had been negotiating a lease, that Lawrence wanted to lease the space to Tusk, and that Lawrence would not allow Howell to extend his lease. At that point, more than two years remained of the three-year period

17

Howell also urges that implied terms are "disfavored at law" (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 169), arguing that the trial court would not have had to imply a durational term if it had adopted his interpretation of paragraph 5. But this argument begs the question whether the court was *required* to imply a durational term—a point Howell does not address. He suggests that a durational term would be expected in an agreement like the NCA while a provision limiting the time to file a suit would not because statutes of limitation serve that purpose. Assuming Howell is correct that a durational term would be more commonly encountered in a nondisclosure agreement, this fact would not justify disregarding the actual language of paragraph 5 in order to construe it as a durational term.

No doubt more straightforward language could have been used in paragraph 5 to express the parties' intent to limit the time for bringing a suit under the NCA to three years from the date of signing. We agree that some terms may be more easily reconciled with Howell's interpretation of paragraph 5 as a durational term.[15] The fact that some effort is required to

---

specified in paragraph 5, but the cross-complaint was not filed until November 2017. Hence, the agreement to limit the time to file a claim to three years appears to be reasonable.

[15] For example, Howell point outs that paragraph 5 says California law "shall be binding upon the parties, *their heirs, agents and assigns. . . .*" He argues this language would be unnecessary if the provision states a limitations period because non-signing parties are subject to the same limitations period as a matter of law (see *Salaman v. Bolt* (1977) 74 Cal.App.3d 907, 919 [assignee generally stands in shoes of assignor, taking rights and remedies subject to defenses existing against assignor]), but would be necessary in a durational provision because heirs, agents and assignees are not necessarily bound by the same obligations as the original party (*Foreman Roofing, Inc. v. United Union of Roofers etc. Workers* (1983) 144

reconcile either interpretation with the actual language of paragraph 5 underscores just how poorly written paragraph 5 is. When other rules of construction fail to resolve ambiguity or uncertainty caused by the language of a contractual provision, it "must be interpreted most strongly against the party who prepared it." (*Badie v. Bank of America, supra,* 67 Cal.App.4th at p. 801; Civ. Code, § 1654.) That party is Howell.

The language of paragraph 5 is most reasonably read as requiring that any action based on violation of the NCA be brought within three years of the date of the last signature. As Barrel Cellar's cross-complaint was not filed until November 2017, more than three years after Tusk signed the agreement on July 24, 2014, it was time-barred.[16]

## II.

Howell contends the trial court erred in adding him as a judgment debtor. A trial court is authorized to amend a judgment to add a judgment debtor on the ground that a person or entity is the alter ego of the original judgment debtor. (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 815 (*Relentless*).) "It is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. [Citation.] The decision to grant an amendment lies in the sound discretion of the trial court. [Citation.] Great liberality is allowed in granting such amendments." (*Ibid.*)

---

Cal.App.3d 99 [whether assignee succeeds to obligation of a contract depends on intent of parties]).

[16] This conclusion makes it unnecessary for us to determine whether the trial court was correct in its alternative holding that paragraph 5 would be unreasonable if interpreted as a durational term.

"[I]n order to prevail on an alter ego theory, the plaintiff must show that '(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected.' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811, quoting *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285.) Due process considerations require that the new party "controlled the litigation, thereby having had the opportunity to litigate." (*Triplett v. Farmers Ins. Exchange* (1994) 24 Cal.App.4th 1415, 1421.) " 'The alter ego test encompasses a host of factors[.]' " (*Zoran*, at p. 811 [providing long list of nonexclusive factors].) " 'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine. [Citation.]' " (*Id.* at p. 812, quoting *VirtualMagic Asia, Inc. v. Fil–Cartoons, Inc.* (2002) 99 Cal.App.4th 228, 245.) Thus, "[w]hether alter ego has been established ' "is primarily a question of fact which should not be disturbed when supported by substantial evidence." [Citation.]' " (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 155, quoting *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 512; *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072.)

The trial court found a unity of interest and ownership between Howell and Barrel Cellar based on a number of factors, including that Howell is the sole owner and member of Barrel Cellar; "Barrel Cellar and Howell have functioned as a single economic unit" since Barrel Cellar ceased operations as a wine bar in 2015; and Howell failed to properly capitalize Barrel Cellar when he revived its status with the California Secretary of State in 2017. The court noted that Barrel Cellar has no income, revenue-generating business, cash, or bank accounts, and its only assets are "old, used restaurant equipment" in a storage facility and the " 'brand' and 'IP' of the business,

20

which Howell testified does not 'have much, if any, value at this point";
Howell personally pays for the storage unit, the yearly tax to keep Barrel
Cellar active with the state, and the fees of Barrel Cellar's attorney, who is
also Howell's attorney; and Howell's personal address is listed as Barrel
Cellar's principal office and mailing address in its 2017 "Statement of
Information" filed with the Secretary of State. The court found that "since
2017, Barrel Cellar's business has been this litigation" and, although Howell
knew Barrel Cellar was suing under a contract with an attorney fees
provision subject to Civil Code section 1717, he did not capitalize the entity
for any of the prospective liabilities he knew it faced, including its own
attorney fees, a potential attorney fees and costs award in Tusk's favor, and a
potential judgment against it in Lawrence's favor.

The trial court held that justice and equity would be best accomplished
by disregarding Barrel Cellar's corporate form because Barrel Cellar had no
independent purpose for the suit and Howell, by causing the cross-complaint
to be filed solely in Barrel Cellar's name, "sought a one-way litigation field in
which, if he won, he would collect damages and attorney's fees, but if he lost,
Tusk's attorney fee award would be uncollectible. The court found that
Howell revived the suspended LLC for the purpose of prosecuting this case,
knowing it would be unable to satisfy a judgment for Tusk's costs and
attorney fees if it lost, thus "us[ing] a corporate form to attempt to collect
damages, which would go directly to Howell as Barrel Cellar's sole owner,
while at the same time shielding himself from personal liability."

Howell challenges the trial court's finding of a unity of interest[17] as improperly based on its view that Barrel Cellar was undercapitalized for this litigation. He maintains that caselaw requires capitalization to be measured at the time an entity is formed or at the time of the subject transaction, rather than at the time of litigation. Howell further argues that Barrel Cellar was adequately capitalized while in operation.[18]

First, as we have just described, undercapitalization was only one of a number of factors the trial court relied upon in finding alter ego established. All of those factors are supported by substantial evidence.

Regarding capitalization, Howell cites various cases evaluating capitalization at incorporation, or at the time of the transaction upon which the entity is sued, as a factor bearing on whether the entity's corporate existence should be disregarded when it is unable to pay a judgment. (*Shizzle Pop*, *LLC v. Aviva Sports*, *Inc.* (C.D.Cal., Nov. 3, 2010, No. CV10-02574-RGK (SSx)) 2010 WL 11509148 ["Even if Aviva Sports were presently

---

[17] We decline Tusk's suggestion to resolve the issue of whether a "unity of interest" exists solely on the basis of Howell's "admission" that he and Barrel Cellar "have a unity of interest in this litigation." Tusk and Quince's "Request for Admission No. 15" stated: "Admit that there is unity of interest between Barrel Cellar, LLC and Jim Howell." Barrel Cellar responded, "The Barrel Cellar specifically objects to Request for Admission No. 15 on the grounds that it calls for a legal conclusion and the term 'unity of interest' is vague and ambiguous. Subject to and without waiving the foregoing, The Barrel Cellar only admits that as it and Jim Howell were both parties to the Non-Circumvention, Non-Disclosure, and Confidentiality Agreement and were both harmed by Quince and Tusk's breach of the same, that they have a unity of interest in this litigation." Barrel Cellar's full response makes clear that it was not admitting a "unity of interest" that would in and of itself satisfy the first aspect of the alter ego test.

[18] The record does show, however, that when Barrel Cellar ceased operations in 2015, after its cash was exhausted, Howell paid the remaining sums owed to suppliers and vendors from his personal funds.

insolvent, courts will only find alter ego liability where the subsidiary is so undercapitalized at the outset of incorporation that it is unable to meet debts that may arise in the course of business"]; *John T. Callahan & Sons, Inc. v. Dykeman Elec. Co.* (D. Mass. 2003) 266 F.Supp.2d 208, 234 ["insolvency is the inability to pay debts as they become due . . . and is evaluated 'at the time of the litigated transaction' "]; *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 836 [upholding trial court's finding of adequate capitalization "in relation to the reasonable requirements of [the company's] business and corporate purposes"]; *Pearl v. Shore* (1971) 17 Cal.App.3d 608, 617 [observing, in upholding trial court's refusal to disregard corporate entity, that "the troubles of [the corporation] seem to be attributable to poor management . . . rather than initial undercapitalization"]; *Schoenberg v. Romike Properties* (1967) 251 Cal.App.2d 154, 165–166 ["undercapitalization as compared with [corporation's] operations" as one of a number of factors supporting imposition of personal liability as alter ego]; *Claremont Press Publishing Co. v. Barksdale* (1960) 187 Cal.App.2d 813, 816–817 [upholding imposition of personal liability where, among other factors supporting disregard of corporate entity, $500 capital was contributed to venture that incurred costs of $650 to $1,000 per week].)

Tusk, on the other hand, points to cases finding inadequate capitalization at the time of a lawsuit relevant to the alter ego analysis. *Digby Adler Group LLC v. Image Rent a Car, Inc.* (N.D.Cal. 2015) 79 F.Supp.3d 1095, 1107, viewed the fact that the corporate defendants were inadequately capitalized—as indicated by their having "declared bankruptcy shortly after this lawsuit was filed"—as one of the factors favoring an alter ego finding. In *Relentless, supra,* 222 Cal.App.4th at page 816, the fact that a partnership (Airborne) had been insolvent since judgment was entered

against it in the underlying litigation was one of the factors supporting a finding that it would be inequitable to treat Airborne as a separate entity.[19]

"It is a fundamental rule that '[t]he conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case.' " (*Associated Vendors, Inc. v. Oakland Meat Co.*, *supra*, 210 Cal.App.2d at pp. 836–837, quoting *Stark v. Coker* (1942) 20 Cal.2d 839, 846; *Automotriz del Golfo de California S. A. de C. v. Resnick* (1957) 47 Cal.2d 792, 797.)  It follows that the appropriate time to measure an entity's undercapitalization or insolvency may also vary.

The present case is notably different from those Howell relies on, all of which addressed whether an individual or another entity could be held liable in a suit or for a judgment against a corporate entity arising from the corporate entity's business.  Here, Barrel Cellar ceased operating in 2015 and, when reinstated in 2017, did not engage in any business and had no assets or income separate from Howell's.  Howell caused Barrel Cellar to file a cross-complaint against Tusk based on a contract with an attorney fees

---

[19] The trial court in *Relentless* found the individuals were alter egos of Airborne, but refused to add them as judgment debtors because the plaintiff failed to show they acted with wrongful intent. (*Relentless*, *supra*, 222 Cal.App.4th. at pp. 815–816.)  Reversing, the *Relentless* court observed that the individuals "used Airborne's funds to pay their personal debts"; it was undisputed that Airborne had been insolvent since the underlying litigation; "[t]he [individuals] continue to operate their business, but as Airborne's sole limited partners and the sole shareholders of its general partner, they are in complete control of Airborne"; and "[a]s long as Airborne is the sole judgment debtor," it is highly unlikely it will ever have assets with which to satisfy the judgment. (*Id*. at p. 816.)  "Given the trial court's finding that the [individuals], Airborne, [and the corporations] are one and the same, it would be inequitable as a matter of law to preclude [the plaintiff] from collecting its judgment by treating Airborne as a separate entity." (*Ibid*.)

provision without ensuring that Barrel Cellar had sufficient funds to meet its prospective obligations in the litigation it initiated. Under these circumstances, Howell's failure to capitalize Barrel Cellar at the time it asserted claims against Tusk and Quince supports the trial court's finding that adherence to the corporate form would cause an inequitable result.

Howell asserts that he had no choice but to revive the LLC to defend against Lawrence's suit because a suspended entity cannot defend litigation against it. (*Bourhis v. Lord* (2013) 56 Cal.4th 320, 324; *Ransome-Crummey Co. v. Superior Court* (1922) 188 Cal. 393, 397.) This argument is beside the point. Lawrence sued Howell individually as well as Barrel Cellar. Howell chose to file the cross-complaint in Barrel Cellar's name alone, without ensuring the LLC would be able to satisfy a judgment against it.[20] As the trial court explained, Howell knew the NCA contained an attorney fees provision that would entitle the prevailing party to attorney fees. The evidence supports the trial court's findings that Howell revived Barrel Cellar in order to sue Tusk, and that by filing the cross-complaint solely in Barrel Cellar's name, Howell created a situation in which he would be able to recover attorney fees from Tusk if he prevailed, but Tusk would be unable to recover her fees if she prevailed.

---

[20] Howell's suggestion that he may not have had standing to assert claims against Tusk and Quince is both impermissibly raised for the first time on appeal (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 [" 'New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal' "]) and inconsistent with his position in the trial court. Howell was a party to the NCA and stated in his discovery responses that both he and Barrel Cellar were harmed by the alleged breaches of the agreement. In opposing the motion to add him as a judgment debtor, Howell argued (among other things) that he was not *required* to join Barrel Cellar's cross-complaint; he never suggested he lacked standing to do so.

Howell asserts, as he did in the trial court, that the claims against Tusk were "more naturally pursued" by Barrel Cellar. The trial court found Barrel Cellar had "little to no interest" in attempting to recover damages from Tusk because it "has not operated a commercial business since 2015" and, despite listing Barrel Cellar's business as "Wine Bar" in its November 9, 2017 Statement of Information, Howell admitted during his deposition that he never "think[s] about opening up a new wine bar." The trial court concluded Howell was "seeking an inequitable advantage by reviving Barrel Cellar and asserting claims on its behalf although it had no independent purpose for doing so" and using the corporate form to "attempt to collect damages, which would go directly to Howell as Barrel Cellar's sole owner, while at the same time shielding himself from personal liability."

Howell challenges the trial court's findings by arguing that Barrel Cellar necessarily had an interest in recovering damages which would compensate it for losses caused by Tusk and Quince, and that it did not need an "independent purpose" for seeking that recovery. According to Howell, the fact that Barrel Cellar is not currently operating as a wine bar is irrelevant, because if it had prevailed, Barrel Cellar could put its recovery toward any lawful purpose, including a new business venture. Howell disputes the court's statement that any recovery would go "directly" to him, arguing that recovery would go to Barrel Cellar, which would have to pay taxes, and then only potentially to him, if Barrel Cellar "opted" to make a distribution to him.

Howell misses the point. As the trial court explained, "The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and

26

for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form."  (*Kohn v. Kohn* (1950) 95 Cal.App.2d 708, 718; *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301.)  Even if there are " 'business reasons sufficient to justify and support the formation or continuation of the corporation,' " " 'the separate corporate entity will not be honored where to do so would be to defeat the rights and equities of third persons.' " (*Ibid.*)  The court properly considered the factors relevant to determining whether Barrel Cellar acted as Howell's alter ego "at least for purposes of prosecuting this action."

Howell correctly asserts that the alter ego doctrine "does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form," and "[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy this standard." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.) Unlike *Sonora Diamond Corp.*, however, the present case does not involve a plaintiff suing an insolvent entity that became unable to satisfy its contractual obligations after ceasing operation of an unprofitable business. Howell caused Barrel Cellar to initiate litigation against Tusk and Quince without capitalizing the LLC sufficiently to meet the obligations arising from this action.  In other words, the issue is not simply that Tusk and Quince would not be able to collect on a judgment for attorney fees and costs if they prevailed on the claims Barrel Cellar asserted against them, but that Howell created a situation in which Barrel Cellar could pursue recovery against Tusk and Quince without risk of having to pay the resulting judgment if its claims were not successful.

Substantial evidence supports the trial court's conclusion that Barrel Cellar was Howell's alter ego for purposes of this litigation.

## DISPOSITION

The judgment is affirmed. Tusk shall recover costs on appeal.

_____

Mayfield, J.*

We concur:

_____

Richman, Acting P.J.

_____

Miller, J.

*Quince & Co., LLC, et al. v. The Barrel Cellar, LLC, et al.* (A160014)

*Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.